# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| In Re Subpoena in ) | |
| ) | |
| COLLINS, et al., ) | |
| ) | |
| ) | |
| v. ) | Case No. 1:07-mc-00333 (RJL) |
| ) | |
| ) | |
| ) | |
| SMITHKLINEBEECHAM CORP. d/b/a, ) | |
| GLAXOSMITHKLINE, INC. ) | |
| ) | |
| _____ ) | |

## RESPONDENT'S MEMORANDUM
## IN OPPOSITION TO MOTION TO QUASH

NOW COMES SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK") and

files this opposition to the United States Attorney's Motion to Quash filed on behalf of David

Voyles, respectfully showing the Court as follows:

## INTRODUCTION

In February 2007, Mary Collins and her two adult children sued GSK in state court in

Philadelphia, Pennsylvania, claiming that the prescription medication Paxil® ("Paxil")[1] caused

Mr. Bobby Collins (plaintiffs' husband and father, respectively) to commit suicide.  (Collins, et.

al. v. SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Inc., Ct of Comm. Pleas of

Phila. Cty, Pa. Civil Action No. 00762.)  Essentially, the Collins allege that after starting Paxil,

---

[1] Paxil is generally classified as a selective serotonin reuptake inhibitor, or SSRI.  Paxil has been approved by the U.S. Food and Drug Administration ("FDA") as safe and effective for the treatment of a number of indications, involving depression; panic disorder; generalized anxiety disorder; and post-traumatic stress disorder in adult patients.

Mr. Collins' behavior changed dramatically and he became a completely different person. GSK vigorously disputes that Paxil played any role in Mr. Collins' death. GSK asserts that Mr. Collins' behavior before Paxil did not differ from his behavior while taking Paxil and that depression and other psychiatric disorders caused Mr. Collins' suicide.

At the time of his death, Mr. Collins was an employee of the Smithsonian Institution ("Smithsonian") working in Washington, D.C. Even though Mr. Collins and his wife resided in Maryland at the time of his death and his death occurred in Maryland, the Collins plaintiffs filed their lawsuit in the Court of Common Pleas of Philadelphia County, Pennsylvania.[2]

GSK had no choice in the selection of where the Collins filed their lawsuit. GSK cannot remove the case to federal court because GSK's headquarters are located in Pennsylvania (likely the reason plaintiffs chose a Pennsylvania state court as their forum). As a result, GSK cannot issue a federal subpoena to command witnesses to attend depositions to preserve crucial trial testimony. Rather, GSK is forced to issue Out-of-State Commissions for depositions through the Pennsylvania state court and have these Commissions honored by sister jurisdictions such as the District of Columbia Superior Court.

In its Motion to Quash this subpoena, the Government makes the blanket and unsupported assertion that the subpoena would compel Mr. Voyles to testify in his "official capacity" and to "divulge official government information". (Mot. Quash, 1, 3.) These representations are flat wrong. This dispute has nothing to do with asking Mr. Voyles to testify in his "official capacity" or "divulge official government information." Rather, it is a garden-variety deposition to ask Mr. Voyles about his interactions, observations and knowledge about a former co-worker, Bobby Collins. Strikingly absent from the Government's Motion to Quash is

---

[2] Mrs. Collins and her daughter currently reside in Virginia. Mrs. Collins' son currently resides in Ohio.

*any* discussion of the nature of the lawsuit between the Collins and GSK and the dispute between GSK and the Smithsonian that ultimately resulted in this matter being before this Court. The underlying facts of that dispute, taken together with the applicable law, demonstrate that federal sovereign immunity cannot extend to Mr. Voyles in this case and the Government's reliance on it unacceptably exceeds the boundaries of that doctrine. Accordingly, the United States' Motion to Quash should be denied, and this matter remanded back to the Superior Court for the District of Columbia with instructions that the deposition proceed.

## STATEMENT OF FACTS

Bobby Ray Collins committed suicide in his Maryland home on February 14, 2002. At the time of his death, Mr. Collins was employed as an investigator in the Office of Protection Services ("OPS") in the Security Services Division of the Smithsonian Institution, with his office located in Washington, D.C. On or about February 7, 2007, plaintiffs elected to file a lawsuit in state court in Pennsylvania against GSK, claiming Mr. Collins' ingestion of the prescription drug Paxil caused him to commit suicide. In their lawsuit, the Collins seek millions of dollars, including punitive damages, from GSK for the death of Mr. Collins. (See Pls.' Compl. (attached as Ex. A) and Report of Bunin Assoc., the Collins' economic damages expert (attached as Ex. B).)

Recognizing that it would be severely limited in the ability to call crucial fact witnesses to testify live at trial in state court in Pennsylvania, GSK diligently began to conduct informal interviews of individuals who knew Mr. Collins, with an eye toward determining whom to formally depose to memorialize and preserve their testimony for the trial in Philadelphia, Pennsylvania. By Order of the Court in Philadelphia over-seeing the Collins' lawsuit, the Collins lawsuit must be "trial ready" on or before November 7, 2007. (See July 29, 2007 Case

Management Order #3, (attached as Exhibit C) and August 20, 2007 Consent Order (attached as Exhibit D).)  To prepare its case for trial and defend against the Collins' allegations, GSK's counsel interviewed Mr. David Voyles with his consent on May 3, 2007, at his home in Gaithersburg, Maryland.  At no time during this interview did Mr. Voyles assert that he possessed information about Mr. Collins due to his work at the Smithsonian that somehow implicated the sovereign immunity of the Smithsonian.

Mr. Voyles worked with Mr. Collins on a daily basis for several years as his direct supervisor at OPS, and is in the best position to provide testimony about Mr. Collins' personality and behavior before he ever took Paxil.  (Mr. Voyles worked with Mr. Collins from 1993-1999.)  Because of his six years of working with Mr. Collins, he is in a unique position to rebut the claims that Mr. Collins' behavior after Paxil differed from his behavior before taking Paxil.  He is also the **only** current employee from the Smithsonian that GSK seeks to depose.

Not only did Mr. Voyles not invoke any claims of sovereign immunity during his informal interview with counsel for GSK, but he never stated any reasons he would not want to, or would not be able to, speak with GSK's counsel about his personal knowledge of and relationship with Bobby Collins.  On the contrary, Mr. Voyles was cooperative and provided a host of key facts regarding Bobby Collins' personality and behavior **before** taking Paxil, all of which are highly relevant and critical to GSK's defense of the Collins' wrongful death / products liability lawsuit in which they seek millions of dollars.

During GSK's subsequent informal interviews with other Smithsonian employees, GSK learned that counsel for the Smithsonian had instructed the employees not to continue speaking with GSK until Smithsonian counsel had a chance to speak with GSK counsel.  Counsel for GSK contacted Ms. Christine Nicholson, Associate General Counsel for the Smithsonian, to discuss

her concerns.  After counsel for GSK explained the nature of the lawsuit; the reasons for the

interviews; and emphasized that this case in no way implicated the Smithsonian or any of its

official matters, Ms. Nicholson asked, and GSK agreed, that all further interviews of current

Smithsonian employees be arranged through her.  Ms. Nicholson agreed to contact the

employees that GSK wished to interview and try to arrange those interviews.

     Ms. Nicholson also informed counsel for GSK that the Smithsonian would not respond to

any subpoena for deposition testimony issued from a state court, citing federal sovereign

immunity.  Given this representation and the need for Voyles' deposition at the upcoming trial in

Philadelphia, GSK petitioned the Pennsylvania court for a Commission and Letter Rogatory to

the Superior Court for the District of Columbia.  The court granted this petition and issued a

Commission and Letter Rogatory and Order on July 24, 2007.  (Attached as Ex. E.)

     In a subsequent telephone call, Ms. Nicholson agreed to arrange an informal interview of

Mr. James McLaughlin, another potential fact witness with whom GSK wished to speak, and

was present when GSK conducted that interview on August 2, 2007.  At the conclusion of this

meeting, counsel for GSK informed Ms. Nicholson that GSK likely would seek to depose only

Mr. David Voyles, and inquired whether the Smithsonian's position was still the same -- namely,

that it would refuse to produce any current employees on grounds of sovereign immunity.  Ms.

Nicholson stated that any state court subpoena served on Mr. Voyles would be obtained by her,

and forwarded to the U.S. Attorney's Office for subsequent removal proceedings and a motion to

quash.

     GSK expressed on multiple occasions, both in-person and by letter, that it would be more

than willing to work with Mr. Voyles' schedule to make it convenient for the witness.  (See

Letter to Christine Nicholson from GSK counsel Lauren Reeder dated August 3, 2007 (attached

as Exhibit F).)  GSK undertook these efforts despite the fact that its position was, and still is, that

it seeks to depose Mr. Voyles only in his individual capacity regarding his personal observations

and knowledge of a man with whom he worked on a daily basis.

The Superior Court for the District of Columbia, upon receipt of the Commission and

Letter Rogatory from the Court of Common Pleas of Philadelphia County (attached as Exhibit

G), issued the subpoena on August 15, 2007, commanding Mr. Voyles to appear and give

deposition testimony on August 29, 2007 at 5:00 pm.  The subpoena was personally served on

Mr. Voyles on August 16, 2007.  Counsel for GSK sent a courtesy copy of the subpoena to Ms.

Nicholson on the same day, in which GSK again noted that it was willing to arrange an

alternative date and time if needed for the convenience of the witness, and that it would limit the

deposition to no more than two hours.  (See Letter to Christine Nicholson from Lauren Reeder

dated August 16, 2007 (attached as Exhibit H).)  On August 27, 2007, counsel for GSK received

in the mail the Notice of Removal and instant Motion to Quash.

## ARGUMENT

GSK does not dispute that "in state court the federal government is shielded by sovereign

immunity, which prevents the state court from enforcing a subpoena."  Houston Business

Journal, Inc. v. Office of the Comptroller of the Currency, United States Dep't. of Treasury, 86

F.3d 1208 (D.C. Cir. 1996).  The Government cannot use this doctrine to shield Mr. Voyles from

providing testimony in this case.  The matter at hand stands in stark contrast to the circumstances

of the cases cited by the Government because (1) GSK served Mr. Voyles personally and not in

his official capacity with a subpoena seeking testimony on matters ***completely unrelated*** to

"official government information"; (2) GSK has no interest in and does not seek Smithsonian

documents, or documents of any kind; (3) GSK made it abundantly clear the deposition could be

scheduled at a time that will ensure it does not interfere with Mr. Voyles' job duties, and even

noticed it for 5:00 PM; and (4) GSK's demonstrated need for Mr. Voyles' testimony in the

underlying case, and the importance of obtaining fact witness testimony in the Collins' lawsuit,

far outweigh any purported adverse impact on the public.  Accordingly, there is no sovereign

immunity to prevent Mr. Voyles' deposition and the motion to quash should be denied.

### A.    Sovereign Immunity Cannot Attach to Mr. Voyles' Personal Observations and Interactions with a Co-Worker.

When sovereign immunity is raised as a defense, the threshold matter the court must

determine is whether the doctrine applies at all.  Panola Land Buyers Ass'n. v. Shuman, 762 F.2d

1550 (11th Cir. 1985).  Here, it does not.  Sovereign immunity is a defense only if the action can

be considered one that is against the United States.[3]  When an action is filed naming a person

who is employed as a federal officer, the court, at the very least, must analyze the facts of the

case and the relief sought to determine whether the suit is in reality against the individual or

against the federal government.  14 Charles Alan Wright, Arthur R. Miller, & Edward H.

Cooper, Federal Practice & Procedure, Jurisdiction § 3655 (3d ed. 2007); see, e.g., Mine Safety

Appliances Co. v. Forrestal, 326 U.S. 371, 374 (1945); Helton v. U.S., 532 F. Supp. 813, 819

(S.D. Ga. 1982) ("before imbuing a federal official with a derivative cloak of sovereign

immunity, the Court must scrutinize the facts of the case to determine whether 'by obtaining

---

[3] The United States Attorney, on behalf of David Voyles, removed this subpoena matter pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, citing Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 412-415 (D.C. Cir. 1995).  Removal under that section is proper when predicated on an allegation of a colorable federal defense.  Id. at 414-15.  The Government asserts the defense of federal sovereign immunity, and because removal jurisdiction is not contingent on the ultimate merits of the federal defense asserted, Pollock v. Barbosa Group, Inc., 478 F. Supp. 2d 410, 412 (W.D.N.Y. 2007), GSK will not contest removal to this court on this basis.  However, GSK does assert, for the reasons stated herein, that the subpoena does not act against the sovereign in this matter and, as such, federal sovereign immunity is not a valid defense on the merits.  If this Court, upon evaluating the arguments of the parties, agrees that sovereign immunity does not apply, then it must remand this matter to the Superior Court of the District of Columbia, as jurisdiction would no longer be proper in this court.  See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears the district court lacks subject matter jurisdiction, the case shall be remanded.")

relief against the officer relief will not, in effect, be obtained against the sovereign.'"). The party asserting that it is entitled to sovereign immunity has the burden of production and persuasion. Bowers v. National Collegiate Athletic Ass'n., 475 F.3d 524, 546 n.25 (3d Cir. 2007); see also Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002).

In sum, when undertaking the analysis, courts look to the effect of a judgment that might be rendered in an action to determine whether it is "against the United States." Panola, 762 F.2d at 1555. The test is well-settled: an action is barred by sovereign immunity if the relief sought would: (1) expend itself on the public treasury or domain; (2) interfere with public administration; or (3) restrain the government from acting or compel the government to act. Id., citing Dugan v. Rank, 372 U.S. 609, 620 (1963).

Not one of these are at issue with Mr. Voyles' deposition. In Panola, for example, claims seeking a declaratory judgment that a government agency violated its obligations in specific ways were not barred by sovereign immunity because no interference with the public administration would occur if the requested relief was granted. Id. at 1556. On the other hand, the claim for permanent injunction requiring the government agency to grant plaintiff's application and make funds available to certain individuals was barred by sovereign immunity because it "interfere[d] with public administration." Id. By way of further example, where a plaintiff sought an order compelling federal officers to perform what it asserted was a ministerial duty, the court held the real defendant was the United States, because a judgment would direct spending of federal funds to upgrade the Navy's sewer system. Coggeshall Development Corp. v. Diamond, 884 F.2d 1 (1st Cir. 1989). Similarly, where the plaintiff sought an injunction ordering a federal officer not to take a particular action, which action did not conflict with the terms of his valid statutory authority, the relief sought was against the sovereign. Larson v.

Domestic & Foreign Commerce Corp., 337 U.S. 682, 688-89 (1949).  Notably, the Larson court also held that "[t]here may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign." Id. at 690.

When examining the facts of this case to analyze whether the Government's assertion of the defense of sovereign immunity should stand, it is clear that the relief GSK seeks cannot fall under any of the requirements for sovereign immunity to attach.  A recitation below of the information GSK seeks to elicit from Mr. Voyles -- information he offered voluntarily in his interview -- leaves no room for doubt that this subpoena does not operate on the sovereign because the information cannot compel the government agency to act, compel the agency to expend funds, or interfere with the agency's administration.  Here are the facts that GSK seeks to establish about Bobby Collins (*not* the sovereign) through Mr. Voyles' deposition:

- Voyles stated that Collins was "troubled";
- Voyles described Collins as combative;
- Voyles said that while most people have mostly good days and a few bad days, Collins was someone who had mostly bad days and a few good days;
- Other than a co-worker named Arnold Nicholson, Collins did not get along well with his co-workers;
- Voyles and Collins' co-workers went out of their way to avoid problems with Collins;
- Voyles said it was apparent immediately when Collins arrived at work whether he was going to have a good day or a bad day;
- Voyles said that he and Collins' co-workers would signal to one another when Collins was having a bad day;
- Voyles thought Collins was bipolar because he would respond very differently to the same situation depending on the day;
- Voyles said that one of Collins' co-workers coined the phrase "on a pole" to describe Collins' moods;
- Voyles stated that Collins felt threatened easily;

- Collins appeared to feel threatened by Michael Pickett, a former captain with the Metropolitan Police Department who joined the Smithsonian in 1992;

- Voyles stated that there was at least one occasion on which a confrontation between Collins and Picket nearly became physical;

- Collins also could not handle criticism;

- If Collins submitted a report that had mistakes in it, Voyles said that when he pointed out the mistakes, Collins would be defensive and claim that they were intentional;

- Voyles said that Collins appeared to take no joy from his job;

- Voyles stated that Collins developed colitis, for which he was hospitalized, but was reliable when he was not physically ill;

- Voyles stated that Collins lost a considerable amount of weight and was emaciated;

- Voyles noted that colitis is typically associated with stress and stated that Collins' job at the Smithsonian was not stressful;

- Voyles stated that he was surprised to learn that Collins had sought help from a doctor for his mental health issues;

- Voyles stated that it seemed unlike Collins to seek help;

- Voyles was surprised to learn that Collins committed suicide and said that he always knew something was wrong with Collins, but never knew what it was;

- Although it was apparent that Collins had some sort of problem, Voyles stated that Collins was non-communicative and met Voyles' few attempts to find out what was wrong with "negative reinforcement";

- Collins' unwillingness to communicate was occasionally an issue on the job; and

- Voyles stated that while most investigators were quick to share their findings and progress in an investigation, he had to drag information out of Collins.

These are the very types of inquiries that GSK intends to make of Mr. Voyles. GSK also intends to ask Mr. Voyles about certain documents -- ***documents that are available in and were obtained from the public court record in the United States District Court for the District of Columbia*** -- related to a lawsuit in which both Mr. Collins and Mr. Voyles were named as defendants. That lawsuit, <u>Markell v. United States</u>, went to trial just months after Mr. Collins' suicide. The timing of certain events in that lawsuit coincided with the time-frame leading up to Mr. Collins' suicide. GSK wants to inquire about what, if anything, Mr. Voyles knows about the

impact this lawsuit had on Mr. Collins.  ***GSK is not interested in asking Mr. Voyles about the Government's view about this lawsuit; the Government's internal policies about this lawsuit; or the Government's internal response to this lawsuit.  GSK stipulates that it will not inquire of Mr. Voyles about any of these issues.***  Rather, GSK's interest is in how this lawsuit personally effected Mr. Collins since GSK believes it had a profound impact on him given his poor health and mental condition before he ever took Paxil.

GSK needs all the information identified above from Mr. Voyles because GSK's defense in the underlying case is that Mr. Collins' exhibited long-standing behavior that did not change once he was placed on Paxil.  Mr. Voyles' deposition will allow GSK to establish that Mr. Collins was isolated and had no emotional support; had significant problems at work; had difficulty with seeking help and dealing with problems; and exhibited anti-social behavior long before Paxil.  All of these can contribute or lead to depression and other psychiatric disorders and place a person at an increased risk of suicidal thoughts and behavior.  (See, e.g., Maris, Berman & Silverman, Comprehensive Textbook of Suicidology Table 17.1, p. 414 (2000), (listing "Risk Factors for Suicide Attempts or Suicide") (excerpt attached as Ex. I); see also, American Psychiatric Association, Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors 116-125 (2003) (discussing "Factors altering risk of suicide and attempted suicide") (relevant excerpts attached as Ex. J).)

The dispute over Mr. Voyles' deposition is about personal interactions, observations and knowledge that one co-worker has about another.  That is it.  Yet, because these two former co-workers happen to be employed by the Smithsonian, the Government claims that the fact someone is employed by the federal government cuts off a civil litigant's right to discover that information.  The mere happenstance that they were co-workers at a federal agency cannot

convert Mr. Voyles' deposition into an action against the sovereign or his testimony as being given in his "official capacity". ***If that were true, no federal employee could ever be deposed in state court civil litigation anywhere in the country where the topic was personal interactions with a another co-worker.***

Surely, if there was some information known by a Smithsonian employee in his/her "official capacity", the Smithsonian would have never even allowed GSK's counsel to interview and speak with Mr. James McLaughlin, the other Smithsonian employee interviewed in the presence of the Smithsonian's counsel.  Yet, that is not what happened and at no time did the Smithsonian's counsel instruct Mr. McLaughlin not to answer a question about Bobby Collins because it had to do with "official" business.

GSK's subpoena of David Voyles seeking testimony regarding his personal interactions, observations and knowledge of a co-worker who is now deceased has absolutely nothing to do with any of the subpoenas at issue in the cases cited by the Government.  Enforcing the Government's argument would lead to absurd and patently unfair results.  This is just such an example: (1) David Voyles witnesses a multi-car accident while on-duty and on Smithsonian property; (2) no one else present has the same observation or vantage point about the accident as David Voyles; (3) David Voyles has vital information about the accident that others do not possess ; (4) a family involved in the accident files a product liability lawsuit in Arizona state court against one of the other drivers and the car manufacturer; (5) because the family files the lawsuit in Arizona state court, David Voyles cannot be compelled to come to trial to testify because he lives outside the subpoena power of the court; (6) a party subpoenas David Voyles for deposition under the same procedures as GSK; and (7) the case is not removable to federal court.

Under the Government's position, Mr. Voyles witnessed this accident in his "official capacity" because he was simply on-duty when he made his observations and therefore he cannot be subpoenaed to testify by any party under a claim of sovereign immunity. Boiled down to its essentials, the Government's position is this: from the moment Mr. Voyles arrived at the office at the Smithsonian everything he did was in his "official capacity". That argument not only ignores the sovereign immunity doctrine itself but defies common sense.

Yet, this nonsensical position is just where the Government's unsupported "official capacity" argument leads it. The factual analogy outlined above equally applies to Mr. Voyles. None of the deposed witnesses have provided the unique information that Mr. Voyles possesses as outlined on pages 9 - 10 of this Brief. Thus, GSK cannot obtain this information from sources other than Mr. Voyles.

The Government's extreme and one-size fits all position is not only unsupportable but it is patently unfair to GSK. GSK had *zero* control and influence over *where* Mr. Collins chose to work; *whom* he associated with during his time at the Smithsonian; *who* has knowledge about his pre-Paxil behavior and interactions with others that is of critical importance to GSK's defense; and *where* the Collins decided to file their lawsuit. Notably, the Collins are not opposing GSK's efforts to depose Mr. Voyles. Instead, it is Mr. Collins' former employer who maintains that somehow the information known to Mr. Voyles about a co-worker -- which he voluntarily provided in an interview -- cannot now be given under oath in a deposition to allow it to be admitted into evidence at the trial of the Collins' lawsuit. GSK respectfully submits that the Smithsonian's draconian view of the sovereign immunity doctrine is a gross distortion of the application of that doctrine.

Asking a person for their personal interactions, observations and knowledge and opinions about another co-worker are the quintessential example of a situation where a federal employee is "purport[ing] to act as an individual" as described in <u>Larson</u>. These types of interactions, observations and knowledge are the antithesis of knowledge acquired in the course of someone's official duties. Thus, no federal sovereign immunity can attach to prevent Mr. Voyles' deposition in the underlying <u>Collins</u> lawsuit. Moreover, even if the Government were to assert that requiring Mr. Voyles to testify about the timeline of events of the earlier lawsuit demonstrates that the testimony is somehow "inseparable from his job duties", this is not only inaccurate, but it is also not the test for determining if sovereign immunity applies. The fact remains that the lawsuit is public information, and any details about the lawsuit that relate to official Smithsonian information are irrelevant to GSK. (Again, GSK stipulates that it will not inquire of Mr. Voyles about official government policy on that lawsuit.)

In sum, Mr. Voyles appearance to provide testimony in his individual capacity about his personal knowledge and interactions with a former co-worker require no expenditure from the public treasury (the Government does not argue that it will); do not compel the federal government to act or refrain from acting (again, the Government does not argue that it will);, and do not interfere with the public administration (the Government fails to offer any facts to support to the contrary).

        **B.**      **The Government Relies on Case Law that Has No <u>Bearing on the Reason for Mr. Voyles' Deposition</u>.**

The Government fails to present any evidence to support its argument that this subpoena will interfere with the public administration. It has attached no exhibits, much less even an affidavit or declaration, that would support its defense of sovereign immunity. The

14

Government's position is essentially: "It is what we say it is; no proof is required."  The

Government's unsupported reliance on <u>Kennedy v. Rabinowitz</u>, 318 F.2d 181 (D.C. Cir. 1963).

(Mot. Quash 3) for the proposition that the subpoena served on Mr. Voyles acts against the

United States because it interferes with the public administration cannot withstand scrutiny.

In <u>Rabinowitz</u>, appellees filed a declaratory judgment against the government, seeking a

declaratory judgment that they were exempt from registering under the Foreign Agents

Registration Act.  318 F.2d at 182.  Unsurprisingly, the court dismissed the case as an

unconsented suit against the United States, stating, "[o]bviously, restraining the Attorney

General from enforcing the criminal laws of the United States would 'interfere with the public

administration.'"  <u>Id.</u> at 183.  The distinction between the effect of the subpoena at issue in the

instant matter and the effect of the action in <u>Rabinowitz</u> is plain: there is no criminal law at issue

in the <u>Collins</u> matter and GSK seeks no testimony from Mr. Voyles that in any way operates to

prevent the federal government from enforcing any law, civil or criminal.

However, even the line of cases holding that a state court subpoena cannot be enforced

against a federal official involve situations drastically different from those present in the

underlying <u>Collins</u> lawsuit, and far more likely to "interfere with the public administration"

because the testimony sought was directly linked to the particular federal employee's official

duties and responsibilities.  <u>See</u> <u>Environmental Enterprises, Inc. v. U.S. E.P.A.</u>, 664 F. Supp 585

(D.D.C. 1987) (EEI obtained subpoenas for testimony and documents seeking to discover

information concerning an ongoing EPA investigation); <u>Boron Oil Company v. Downie</u>, 873

F.2d 67 (4th Cir. 1989) (both parties subpoenaed Downie, an EPA employee, to testify about his

official investigation, as an EPA On-Scene Coordinator, of an alleged gasoline leak at a Boron

Oil Company service station); <u>In re Washington Consulting Group v. Monroe</u>, 2000 WL

1195290 (D.D.C. 2000) (plaintiff in underlying suit sought subpoenas for deposition testimony and documents from certain FAA and DOT officials to support claims that defendant fraudulently represented it had inside information about a failed bid for an FAA contract); Ho v. United States, 374 F. Supp. 2d 82 (D.D.C. 2005) (subpoenas were served on a special agent for the Department of Homeland Security and on the Bureau of Immigration and Customs Enforcement demanding documents and testimony regarding their investigation of a corporation's activities).

Contrary to the Government's bald assertion that the "within matter is all [sic] all-fours" with Sharon Lease Oil Co. v. Fed. Energy Reg. Comm'n, 691 F. Supp. 381 (D.D.C. 1988), that case undermines its argument.  In Sharon Lease Oil the underlying action pending in Texas state court concerned a plaintiff who sued the Oil Operators, claiming they had converted gas that belonged to him. The Oil Operators counterclaimed, and the plaintiff asserted the *Noerr-Pennington* doctrine as a defense.  Id. at 382.  The Oil Operators sought deposition testimony of a FERC official, and certain FERC documents.  Id.  FERC moved to quash subpoenas issued by the D.C. Superior Court.  Id.

In analyzing whether the action was against the sovereign, such that removal by FERC was appropriate, the court noted, "[i]t is not contested that the proposed deposition of [the FERC employee] would concern actions taken by [him] only in his official capacity."  Id.  Moreover, the court stated,

> The background facts . . . demonstrate that the subpoena is intended to discover information and documents under the control of FERC.  The subpoena is directed to Kilchrist in his capacity as a FERC employee.  The Oil Operators plan to question Kilchrist about his actions as a FERC employee.  They have directed Kilchrist to produce FERC documents.  They seek information that Kilchrist gained through his activities at FERC.  There is no doubt

> that Kilchrist is sought in his official capacity. As such, the subpoena issued against Kilchrist, a FERC representative being called upon to produce documents and to testify, can be equated with a subpoena against FERC.

Id. at 382-83.

The court then went on to examine whether sovereign immunity precluded the subpoena of the FERC employee, citing the instructions from the D.C. Circuit that "[i]f 'the essential nature and effect of the proceeding may be such as to make plain that the judgment sought would . . . interfere with the public administration,' the suit is one against the sovereign." Id. at 383 (citing Kennedy v. Rabinowitz, 318 F.2d 181, 183 (D.C. Cir. 1963). The Sharon Lease Oil court concluded,

> Th[e] subpoena will operate against FERC in that Kilchrist will be compelled to appear for a deposition in his official capacity, testify about FERC matters obtained by Kilchrist while acting as a FERC employee, and produce FERC documents. **No argument has been made that Kilchrist is being sought to testify as to personal matters** . . .

Id. (emphasis added). Therefore, the court concluded the subpoena would operate against the sovereign.

The court also pointed to the decision in Alex v. Jasper Wyman & Son, 115 F.R.D. 156 (D. Me. 1986), wherein the court stated that when a nonparty government agency is served with a subpoena, "the court should balance the interest of the party seeking disclosure and the legitimate demands of proper judicial administration against the public interest favoring the conservation of government resources and the protection of orderly governmental operations." Id. at 384 (citing Alex, 115 F.R.D. at 158-59). In Sharon Lease Oil, the court held the balance weighed in favor of the public, considering it significant that "FERC has come forward with evidence which would indicate that [the employee's] absence for even a short time from his

17

duties would be disruptive", while the Oil Operators did not come forward with "any evidence" demonstrating a "compelling need". Id. Further, the court accorded importance to the fact that there was the possibility, as FERC asserted, that requiring him to testify would interfere with his advisory function in a "pending related matter." Id. at 383-84. Also key to the court's conclusion that the balance weighed in favor of FERC was the fact that several other witnesses who apparently had the same information as Kilchrist had already been deposed, and others remained available for deposition. Id.

The circumstances described in Sharon Lease Oil are strikingly different from those surrounding Mr. Voyles' subpoena. First, unlike the FERC employee there, Mr. Voyles is not being sought in his official capacity, and will not be compelled to testify about official Smithsonian matters. As set forth above, GSK seeks Mr. Voyles' deposition only to memorialize for the record the statements about his personal observations of a co-worker, which he made **voluntarily** in an informal interview. Describing a co-worker's personality traits and overall behavior, including observations such as he was "troubled", "combative", or even erratic can hardly be considered "official" Smithsonian matters.

Second, GSK has not sought to compel Smithsonian documents, further undercutting the Government's argument that he is sought in an official capacity. Third, contrary to Sharon Lease Oil, where "[n]o argument [was] made that [the employee was] being sought to testify as to personal matters", that is ***precisely*** the argument GSK has made from its first communication with counsel for Smithsonian and continues to make here. Fourth, the Government has made no assertion and has presented zero evidence that requiring Mr. Voyles to testify would interfere with his functions in any way, much less in "presently pending related matter[s]." Moreover, even if they had, it would serve no purpose because GSK is more than willing — as it has stated

18

time and again to counsel for the Smithsonian — to conduct the deposition outside normal business hours, limiting it to no more than two (2) hours.

Additionally, unlike the Oil Operators in Sharon Lease Oil, GSK demonstrates a compelling need for Mr. Voyles' testimony. An individual with whom Mr. Voyles worked on a daily basis for a host of years committed suicide. That individual's family filed a lawsuit alleging a prescription drug caused this. Mr. Voyles, as a former supervisor and co-worker (as opposed to a friend or family member) is in the best position to provide fact testimony about his knowledge, observations of and interactions with that individual. In contrast to the situation in Sharon Lease Oil, *no other current Smithsonian employees with whom Mr. Collins worked have been deposed because none possess the information that Mr. Voyles has about Mr. Collins*.[4]

While the doctrine of sovereign immunity "may, in the proper case, . . . bar a suit brought against a federal officer in her official capacity", Kozera v. Spirito, 723 F.2d 1003, 1007 (1stCir. 1983), it should not be stretched beyond its recognizable limits, particularly when the need for evidence has been demonstrated. Cf. United States v. Nixon, 418 U.S. 683, 710, 94 S. Ct. 3090, 3108-3109, 41 L.Ed.2d 1039 (1974) ("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."). Therefore, the subpoena for Mr. Voyles' deposition does not and cannot operate against the sovereign.

---

[4] Also, at the risk of stating the obvious, the court's point in Sharon Lease Oil that "[o]thers remain available for deposition" is wholly inapplicable here. Presumably the Smithsonian would raise the same defense of federal sovereign immunity for any employee GSK sought to depose. To put a fine point on it, *there is no other way for GSK to obtain information about Mr. Voyles' observations of Bobby Collins in the workplace than to depose Mr. Voyles*.

The Government has also argued the subpoena violates the Supremacy Clause because it is a state court seeking to compel a federal entity's compliance, citing <u>Boron Oil v. Downie</u>. This position is wrong on two fronts.  First, the argument is moot because the subpoena for Mr. Voyles' testimony is not a subpoena that operates against the United States, for the many reasons set forth above.  Second, the court's conclusion in <u>Boron Oil</u> that the district court lacked jurisdiction to compel the EPA employee to appear and testify in a state court action after his agency superiors instructed him not to, was grounded in the fact that compelling such an employee to testify ***contrary to an agency's duly enacted federal regulations*** would have violated the Supremacy Clause.  873 F.2d 67, 69-70.  No such argument has been made here. Accordingly, neither the D.C. Superior Court, nor this honorable federal court on removal, is being asked to enforce a subpoena against a federal entity.

The underlying <u>Collins</u> lawsuit (and Mr. Voyles' personal interactions, observations and knowledge with Bobby Collins) demonstrates that GSK has a compelling need for Mr. Voyles' testimony so that it can introduce that testimony in the trial of  <u>Collins</u> lawsuit.  Mr. Voyles' appearance for a brief deposition outside normal business hours will not interfere with the public administration, and the information sought from Mr. Voyles is plainly not official government information "under the control of" the Smithsonian.  GSK's interests far outweigh the purported public interest.

## <u>CONCLUSION</u>

GSK's subpoena for deposition testimony from David Voyles in no way implicates the sovereign immunity of the U.S. Government.  The federal government's  motion to quash should be denied.

GSK respectfully requests an oral hearing on this matter, pursuant to LCvR 7(f).

Respectfully submitted,


 _/s/ Lauren S. Reeder_____
Lauren S. Reeder (DC 494572)
Mark Brown (DC 455359)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C.  20006
(202) 737-0500


Attorneys for SmithKline Beecham
Corporation d/b/a GlaxoSmithKline


This 7th day of September, 2007.

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on September 7, 2007, I served opposing counsel with a copy of

RESPONDENT'S MEMORANDUM IN OPPOSITION TO MOTION TO QUASH and

accompanying exhibits via this Court's Electronic Case Filing system, and also by causing a

copy of the same to be sent by mail to:


    Kenneth Adebonojo
    Assistant United States Attorney
    Judiciary Center Building
    555 4th Street, N.W.,
    Washington, D.C. 20430


                            _/s/ Lauren S. Reeder_____
                            Lauren S. Reeder
                            King & Spalding LLP
                            1700 Pennsylvania Ave., N.W.
                            Washington, D.C. 20006

02/09/07  15:54 FAX 215 751 5139    GlaxoSmithKline Legal   → KAREN KARPINSKI    ☒001

*Hand served on D. Hersh on 2/9/07*

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| | **FEBRUARY 2007** ° n n **762** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Mary A. Collins, individually and as Personal | SmithKline Beecham Corporation dba GlaxoSmithKline |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 11403 River Meadows Way | One Franklin Plaza |
| Fredericksburg        VA        22408-2099 | Philadelphia              . PA        19102-1225 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| Dwayne R. Collins, individually | |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 912 Chestnut Ridge Drive | |
| Pittsburgh        PA        15205-4709 | |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| Kristin S. Collins, individually | |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |
| 11403 River Meadows Way | |
| Fredericksburg        VA        22408-2099 | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 3 | 1 | ☑ Complaint    ☐ Petition Action    ☐ Notice of Appeal |
| | | ☐ Writ of Summons    ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☑ Mass Tort | ☐ Commerce        ☐ Settlement |
| ☑ More than $50,000.00 | ☑ Jury | ☐ Savings Action | ☐ Minor Court Appeal    ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals    ☐ W/D/Survival |
| | ☐ Other: | | |

| CASE TYPE AND CODE (SEE INSTRUCTIONS) |
|---|
| Paxil MTP TJ |

| STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS) |
|---|
| None |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? | |
|---|---|---|---|
| | | Yes | No |
| October 2004 Paxil MTP No. 1503 | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS (SEE INSTRUCTIONS) |
|---|---|
| Cara J. Luther, Esq. | 1500 Market Street, 12th Floor, East Tower |
| **PHONE NUMBER**          **FAX NUMBER** | Philadelphia              PA        19102-2107 |
| (215) 665-6659          (215) 569-8228 | |
| **SUPREME COURT IDENTIFICATION NO.** | **E-MAIL ADDRESS** |
| 52545 | cluther@baumhedlundlaw.com |
| **SIGNATURE** | **DATE** |
| *Cara J. Luther* | February 7, 2007 |

COPY

02/09/07  15:54 FAX 215 751 5139        GlaxoSmithKline Legal    → KAREN KARPINSKI      ☒002

Karen Barth Menzies, Esq.
George W. Murgatroyd III, Esq.
Robert M. Brava-Partain, Esq.
Jennifer R. Liakos, Esq.
Baum ♦ Hedlund, A Professional Corporation
12100 Wilshire Blvd., Suite 950
Los Angeles, California 90025
Telephone: 310.207.3233
Facsimile: 310.207.4204

Cara J. Luther, Esq.
cluther@baumhedlundlaw.com
Attorney ID # 52545
Baum ♦ Hedlund, A Professional Corporation
1500 Market Street
12th Floor, East Tower
Philadelphia, Pennsylvania 19102
Telephone: 215.665.5659
Facsimile: 215.569.8228

Attorneys for Plaintiff

This Is Not An Arbitration Case
An Assessment of Damages
Hearing Is Required.

| | |
|---|---|
| Mary A. Collins, Individually and as Personal Representative of the Estate of Decedent, Bobby R. Collins, and Dwayne R. Collins, Individually, Kristin S. Collins, Individually, 11403 River Meadows Way, Fredericksburg, VA 22408 )))))))))) | COURT OF COMMON PLEAS TRIAL DIVISION PHILADELPHIA COUNTY |
| Plaintiffs, )))) | _____ TERM |
| vs. ))) | NO. _____ |
| SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, One Franklin Plaza Philadelphia, Pennsylvania 19102 ))))))) | IN RE: PAXIL |
| Defendant. )) | JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT-SHORT FORM ("SUICIDE/ATTEMPTED SUICIDE")

Pursuant to the Order by the Honorable Norman Ackerman, Philadelphia County Court

of Common Pleas, the following Short Form Complaint is utilized in this mass tort action



alleging suicide or suicidality while a plaintiff was taking the prescription medication Paxil ("Paxil") or Paxil CR ("Paxil CR"). The plaintiffs claim that ingesting or being on Paxil or Paxil CR caused the suicide or suicidality as opposed to discontinuing from ingesting Paxil or Paxil CR (hereinafter the "ON-Drug Paxil Cases"). Plaintiffs select and indicate the causes of action raised in their case by checking the appropriate spaces corresponding to the causes listed herein. In the event that a cause not listed herein is being raised, or where a claim requires, pursuant to Pennsylvania law, specific pleading or case-specific facts, Plaintiffs shall add and include said cause or said pleading or facts by way of submitting a Supplemental Short Form Complaint as approved by the Court's Case Management Order.

1.    Plaintiffs Mary A. Collins, Personal Representative of the Estate of Bobby R. Collins, her deceased husband, and their adult daughter, Kristin S. Collins, are individuals who reside at 11403 River Meadows Way, Fredericksburg, VA 22408, and Dwayne R. Collins, their adult son, who resides at 912 Chestnut Ridge Drive, Pittsburgh, PA 15205. Decedent was born on December 30, 1947, and died on February 14, 2002. Decedent was married at the time of his death.

2.    Decedent was initially seen on January 16, 2002, by Dr. John Carroll, a gastroenterologist, for colitis symptoms. Dr. Carroll diagnosed stress-related depression, which was exacerbating Decedent's colitis. He prescribed Paxil 20mg and referred Decedent to psychiatrist Robert Pinney.

3.    Decedent began ingesting his recommended daily dosage of Paxil 20mg on or about January 16, 2002. Decedent continued ingesting Paxil 20mg until January 30, 2002, when his dosage was increased to 30mg daily. He took this dosage until February 14, 2002, on which date he committed suicide.

2

4.      Between January 16, 2002, when Decedent was initially prescribed Paxil and February 14, 2002, Decedent's prescription was titrated up according to the following schedule: The dosage was increased to 30 mg on January 30, 2002.

5.      Decedent suffered the following adverse effects while he was ingesting Paxil:

    a.  Increased colitis symptoms

    b.  Increased depression

    c.  Increased anxiety

    d.  Nervousness

    e.  Insomnia

    f.  Frequent crying

    g.  Loss of appetite

    h.  Physical pain (gunshot wound)

    i.  Death

    j.  Other adverse effects to be determined through the course of discovery.

6.      Decedent committed suicide on February 14, 2002.

7.      Plaintiffs are individuals residing at the above addresses and claim damages as a result of Decedent's suicide.

8.      The following claims are asserted herein:

| | | |
|---|---|---|
| __X__ | Count One: | Breach of Express Warranty |
| __X__ | Count Two: | Breach of Implied Warranty |
| __X__ | Count Three: | Fraud |
| _____ | Count Four: | Intentional Infliction of Emotional Distress |
| __X__ | Count Five: | Loss of Consortium |

3

| | | |
|---|---|---|
| __X__ | Count Six: | Negligence |
| _____ | Count Six: | Negligence *Per Se* |
| __X__ | Count Seven: | Negligent Infliction of Emotional Distress |
| __X__ | Count Eight: | Negligent Misrepresentation |
| __X__ | Count Nine: | Punitive Damages |
| __X__ | Count Ten: | Strict Products Liability and/or Violation of Maryland Products Liability Act |
| __X__ | Count Eleven: | Survival/Survivorship Action |
| _____ | Count Twelve: | Violation of [Applicable State's Consumer Act] |
| __X__ | Count Thirteen: | Wrongful Death |

**WHEREFORE, Plaintiffs** Mary A. Collins, Individually, and as the Personal Representative of the Estate of Decedent, Bobby R. Collins, and Dwayne R. Collins and Kristin S. Collins, Individually, claim of Defendant GlaxoSmithKline for an amount in excess of $50,000, delay damages pursuant to Pa. R.C.P. No. 238, compensatory and punitive damages, as well as attorney fees, interest, and costs of suit in an amount to be determined upon the trial of this matter.

Respectfully Submitted,

By: _Cara J. Luther, Esq._

Cara J. Luther, Esq.

DATED: February 7, 2007

If additional counts are alleged, the specific facts supporting these allegations must be pleaded by the plaintiff in the manner complying with the requirements of the Pennsylvania Rules of Civil Procedure on a Supplemental Short Form Complaint attached to this Short Form Complaint.

4

02/09/07  15:55 FAX 215 751 5139      GlaxoSmithKline Legal    → KAREN KARPINSKI     ☒006

### Attorney's Verification

I, Cara J. Luther, Esq., hereby state:

1.     I am one of the Plaintiffs' Attorneys in this action.

2.     I submit that, pursuant to Pa. R.C.P. No. 1024, I am a person having sufficient knowledge and belief to verify this pleading.

3.     Plaintiffs are outside the jurisdiction of this Court and the verifications cannot be obtained within the time allowed for filing.

4.     I verify that the statements made in the foregoing Civil Action Complaint-Short Form are true and correct to the best of my knowledge, information and belief; and

5.     I understand that the statements in said Complaint are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.


Date: February 7, 2007

Cara J. Luther, Esq.

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

DAVID T. BUNIN, FSA
ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109
300 EAST LANCASTER AVENUE
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700
FAX: (610) 642-4787
E-Mail: BuninAssoc@aol.com

August 9, 2007

Karen Barth Menzies, Esq.
Baum Hedlund Aristei Godlman Menzies PC
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025-7114

Re:  Bobby Ray Collins
Collins v SmithKline Beechan Corp dba Glaxosmithkline

Dear Ms. Menzies:

Enclosed is our actuarial-economic report on Bobby Ray Collins. All opinions expressed in this report are held to a reasonable degree of actuarial and economic certainty. Upon receiving any additional information, we will amend our report accordingly.

Our statement for services rendered is also enclosed. Please let us know if you have any questions.

Sincerely,

Royal A. Bunin, M.B.A.

David T. Bunin, F.S.A.

RAB:DTB/nbc
Enclosures

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

DAVID T. BUNIN, FSA

ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109
300 EAST LANCASTER AVENUE
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700

FAX: (610) 642-4787

E-Mail: BuninAssoc@aol.com

August 9, 2007

Karen Barth Menzies, Esq.
Baum Hedlund Aristei Godlman Menzies PC
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025-7114

Re: **Bobby Ray Collins**
**Collins v SmithKline Beechan Corp dba Glaxosmithkline**

For Professional Services Rendered:

Report dated August 9, 2007 .................. $1,750

(Less Retainer paid July 27, 2007 ........... (1,000)

TOTAL AMOUNT DUE ........... $   750

For your bookkeeping records, our EIN is 23-2868976

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

DAVID T. BUNIN, FSA
ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109
300 EAST LANCASTER AVENUE
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700
FAX: (610) 642-4787
E-Mail: BuninAssoc@aol.com

---

### ACTUARIAL-ECONOMIC REPORT

Loss of Earning Capacity, Fringe Benefits,
and Household Services

of

### Bobby Ray Collins

Prepared by:


Royal A. Bunin, M.B.A.


David T. Bunin, F.S.A.

Prepared for:

Karen Barth Menzies, Esq.
**Baum Hedlund Aristei Godlman
Menzies PC**
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025-7114


August 9, 2007

Bobby Ray Collins

## BACKGROUND

Bobby Ray Collins was born on December 30, 1947 and was, therefore, 54.1 years of age at the time of his death on February 14, 2002. Mr. Collins is survived by his wife, Mary Collins, and 2 children, Dwayne and Kristin.

Mary Collins was born on June 19, 1950 and is, therefore, 57.1 years of age. Mr. and Ms. Collins had one child together, Dwayne Collins, who was born in 1972. The Collins adopted Kristin, whose date of birth is April 22, 1985. Kristin is currently 22.3 years of age, and recently graduated Magna cum Laude from college. Following the birth of their son, Dwayne, Ms. Collins had 2 miscarriages.

At the time of his death, Mr. Collins was employed as a Criminal Investigator with the U.S. government, with an annual salary of $51,115 per year at Grade 11 Step 4 on the General Schedule. Employment documents indicate that he was promoted effective July 18, 1999 from Museum Security Specialist to Criminal Investigator, with an annual salary of $42,071 per year at Grade 11 Step 2 on the General Schedule. The above annual rates include locality pay for working in the Washington DC-Baltimore Metropolitan area. Mr. Collins advanced to Step 3 effective January 1, 2001, wherein his annual salary increased to $48,787 per year including locality pay. These annual rates of earnings from the General Schedule were consistent with Mr. Collins' actual earnings from his tax records. According to his W-2 Wage and Tax Statements, Mr. Collins' total earnings for the last several years were as follows:

| YEAR | EARNINGS |
|------|----------|
| 2001 ...................... | $ 50,146 |
| 2000 ...................... | 47,744 |
| 1999 ...................... | 45,005 |
| 1998 ...................... | 41,754 |

Based upon the above, Mr. Collins' total earnings were increasing at the average rate of 6.3% per year between 1999 and 2001. As indicated above, his base rate of pay at GS 11 Step 4 including locality pay, was in the amount of $51,115 per year at the time of his death

-1-

Bobby Ray Collins

**BACKGROUND**
(continued)

Mr. Collins would have continued to have received increases in his pay based upon annual increases in the General Schedule, in addition to promotions. Mr. Collins would have received Within-Grade promotions (i.e., increases in step) after the appropriate waiting period of 2 years to advance to Steps 5, 6, and 7, and 3 years to advance to Steps 8, 9, and 10. Based upon the foregoing, Mr. Collins would have advanced to Step 5 in January 2003. He would have advanced to Step 6 in January 2005, and to Step 7 in January 2007. Based upon increases in the General Schedule, as printed by the U.S. Office of Personnel Management, the current rate of pay at GS 11 Step 7 for the Washington DC-Baltimore area would be $66,849 per year.

In addition to his regular pay, as a federal employee, Mr. Collins received various fringe benefits including participation in the Federal Employees Retirement System (FERS), and participation in the Social Security retirement system, plus health coverage, life insurance, and participation in the thrift savings plan (TSP).

According to his personnel file, Mr. Collins had received training in various aspects of law enforcement, and met or exceeded performance standards. He also received performance awards, which was equivalent to additional cash benefits.

Following his high school graduation in 1969, Mr. Collins had served in the U.S. military and was a patrol officer with the Metropolitan Police Department.

Prior to his death, Mr. Collins performed various household services for his home and family. Ms. Collins indicated in her Deposition Testimonies of June 7 and June 8, 2007 the types of services her husband provided. These included lawnmowing, yardwork, car washing, and household chores. Ms. Collins indicated that her husband greatly enjoyed working in the yard and was a proficient housecleaner. He would vacuum, dust, and do laundry. They would also shop for groceries together. In addition, Mr. Collins performed maintenance on the family cars. Prior to his death, Mr. Collins' wife was diagnosed with breast cancer in September 2001 and was undergoing chemotherapy treatments at the time of his death.

Bobby Ray Collins

## BACKGROUND
(continued)

Mr. Collins began receiving a tax-free disability pension from his employment with the Metropolitan Police Department in the mid-1970s. Ms. Collins indicated that she now continues to receive these benefits, and that her daughter had received benefits prior to her attainment of 22 years of age. In order to be conservative, the economic value of the reduction of such disability retirement pension benefits from the Police Department will not be considered herein, and would be in addition to the figures contained in this report. Although Ms. Collins is now receiving pension benefits from her husband's employment with the Smithsonian Institute, the calculations of the lost fringe benefits contained herein, represent the value of the lost benefits that would have accrued to Mr. Collins had he continued working until retirement, which would include the additions to his FERS pension benefits and Social Security had he not died.

## LIFE EXPECTANCY

As stated previously, Mr. Collins was 54.1 years of age at the time of his death. The life expectancy as of that date was 25.1 additional years, based upon the 2003 U.S. Life Tables (revised March 28, 2007), prepared by the U.S. Department of Health and Human Services.

Adding the life expectancy of 25.1 years to the age at death of 54.1 years results in an expected life span of 79.2 years. As of the current date, 19.6 years would have remained in the life expectancy period.

## WORKLIFE EXPECTANCY

Had he not died, Mr. Collins would currently be 59.6 years of age. The worklife expectancy to retirement at the age of 66, the age at which an individual with Mr. Collins' date of birth would begin to receive full Social Security retirement benefits is 6.4 years. Based upon retirement at age 70, the worklife expectancy is 10.4 years.

Ms. Collins indicated that Mr. Collins would have been able to retire with 25 years of service, adding in his military service. She indicated that she had not discussed with her husband specifically about retirement, and indicated that there was no mandatory retirement at the Smithsonian Institute. In addition, Ms. Collins spoke of her husband working until Social Security retirement age.

-3-

Bobby Ray Collins

### PAST LOST EARNINGS

The past lost earnings are measured from the date of death through the current date, utilizing an appropriate measure of the lost earnings for that period.

According to Mr. Collins' personnel records, he was employed at GS 11 Step 4 at the time of his death, with base earnings of $51,115 per year, which included locality pay (Washington DC-Baltimore area).

According to Mr. Collins' W-2 Wage and Tax Statements, his total earnings increased at approximately 6.3% between 1998 and 2001. His total earnings include additional cash awards that Mr. Collins had received from his employment. Mr. Collins' base earnings would have increased over the years, based upon increases in the General Schedule, and Within-Grade promotions from Step 4 at the time of his death to Step 7 currently. According to the current General Schedule, the annual rate of earnings for GS 11 Step 7 in the Washington DC-Baltimore area would be $66,849 per year.

On this basis, and allowing for appropriate annual increases in earnings due to increases in the General Schedule and Within-Grade promotions to Steps 5, 6, and 7 after the appropriate waiting periods, the total past lost earnings would be in the amount of $320,324.

### PERSONAL MAINTENANCE EXPENSES

A portion of the above figure must be deducted to represent the amount of money which Mr. Collins would have allocated toward the payment of her own personal maintenance expenses. According to the publication, Consumer Expenditures In 2005, prepared by the U.S. Department of Labor, Bureau of Labor Statistics (Report 998, February, 2007), Table 2: Income, prepared by the U.S. Department of Labor, Bureau of Labor Statistics, personal maintenance expenses would be an average of 30% of the lost earnings.

After deducting for personal maintenance expenses, the net past lost earnings would be in the amount of $224,227.

-4-

Bobby Ray Collins

## FUTURE LOST EARNING CAPACITY

The future lost earning capacity is measured from the current date throughout the duration of the worklife expectancy period, based upon the current projected rate of earnings for Mr. Collins' former position in the amount of $66,849 per year.

The future lost earning capacity is calculated utilizing the total offset method, as described in the Pennsylvania Supreme Court case of "Kaczkowski vs. Bolubasz", 491 Pa. 561, 421 A.2d 1027 (1980). Under this method, future increases in earnings due to inflation are offset by the interest rate, so that no reduction to present value is made. In addition, it is appropriate to make a conservative allowance for future increases due to productivity. This productivity factor refers to those economic conditions which increases an individuals earnings by more than the general rate of inflation. These include promotions, longevity on the job, merit increases, special training such as learning-by-doing or formal training, etc., in addition to advances in technology and the nation's rate of capital accumulation. A conservative allowance for such productivity, as measured by increases in output per personhour in the U.S. economy, would be 2.5% per year, based upon current government statistics. Accordingly, by making the appropriate allowances for productivity, the total future lost earning capacity would, therefore, range between the figures contained under the headings: "0%" increase and "2.5%" increase.

On this basis, the total future lost earning capacity would be as follows:

|  | Increases in Productivity | |
|---|---|---|
|  | 0% | 2½% |
| Retirement at Age 66 .......... | $ 427,834 | $ 457,794 |
| Retirement at Age 70 .......... | $ 695,230 | $ 782,910 |

As indicated previously, a portion of the above figures must be deducted for personal maintenance expenses. After deducting for personal maintenance expenses, the net present value of the future lost earning capacity would be as follows:

|  | Increases in Productivity | |
|---|---|---|
|  | 0% | 2½% |
| Retirement at Age 66 .......... | $ 299,484 | $ 320,456 |
| Retirement at Age 70 .......... | $ 486,661 | $ 548,037 |

-5-

Bobby Ray Collins

## LOST FRINGE BENEFITS

In addition to his regular earnings as a federal employee, Mr. Collins received health coverage, life insurance, participation in the thrift savings plan, Federal Employees Retirement Plan, etc.

The average value of employee fringe benefits in the U.S. labor market ranges between 20% and 30% of gross earnings, according to Table No.637: "Employer Costs for Employee Compensation Per Hour Worked: 2004", as contained in the 2006 Statistical Abstract of the United States (source: U.S. Bureau of Labor Statistics, USDL 05-1056), and data contained in the National Compensation Survey, (NCS), published by the U.S. Department of Labor, Bureau of Labor Statistics. For purposes of this report, the lost fringe benefits are measured for the duration of the work-life expectancy period based upon a conservative measure of the lost fringe benefits as 20% of the lost earnings.

On this basis, the past lost fringe benefits would be in the amount of $64,065.

The future lost fringe benefits, measured from the current date throughout the duration of the work-life expectancy period, and utilizing the total offset method, would be as follows:

|  | Increases in Productivity | |
|  | 0% | 2½% |
| Retirement at Age 66 ........... | $ 85,567 | $ 91,559 |
| Retirement at Age 70 ........... | $ 139,046 | $ 156,582 |

-6-

Bobby Ray Collins

## LOST HOUSEHOLD SERVICES

Prior to his death, Mr. Collins performed various household services for his home and family. Ms. Collins indicated in her Deposition Testimonies of June 7 and June 8, 2007 the types of services her husband provided. These included lawnmowing, yardwork, car washing, and household chores. Ms. Collins indicated that her husband greatly enjoyed working in the yard and was a proficient housecleaner. He would vacuum, dust, and do laundry. They would also shop for groceries together. In addition, Mr. Collins performed maintenance on the family cars.

Such services are best measured utilizing a replacement cost of $8 to $12 per hour, or an average of $10 per hour, based upon information provided by the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics (OES).

According to the governmental publication, American Time Use Survey, prepared by the U.S. Department of Labor, Bureau of Labor Statistics, (USDL 07-0930, June 28, 2007), males spend 10 to 20 hours per week performing household services. Based upon a loss at the lower end of this range, the current value of the lost household services would be in the amount of $5,200 per year.

On this basis, the past lost household services, measured from date of death through the current date, would be in the amount of $28,496.

The future lost household services are measured from the current date throughout the remainder of Mr. Collins' life expectancy, and making an allowance for a gradual reduction in the number of hours provided beginning at age 70 down to zero hours by the end of the life expectancy period.

On this basis, and utilizing the total offset method, the total future lost household services would be in the amount of $78,000.

-7-

Bobby Ray Collins

### SUMMARY

### Retirement at Age 66

| | Increases in Productivity | |
| --- | --- | --- |
| | 0% | 2½% |
| Past Lost Earnings (net)............. | $  224,227 | $  224,227 |
| Future Lost Earning Capacity.......... | 299,484 | 320,456 |
| Past Lost Fringe Benefits............. | 64,065 | 64,065 |
| Future Lost Fringe Benefits........... | 85,567 | 91,559 |
| Past Lost Household Services.......... | 28,496 | 28,496 |
| Future Lost Household Services........ | 78,000 | 78,000 |
| TOTALS........................... | $  779,839 | $  806,803 |

### Retirement at Age 70

| | Increases in Productivity | |
| --- | --- | --- |
| | 0% | 2½% |
| Past Lost Earnings (net)............. | $  224,227 | $  224,227 |
| Future Lost Earning Capacity.......... | 486,661 | 548,037 |
| Past Lost Fringe Benefits............. | 64,065 | 64,065 |
| Future Lost Fringe Benefits........... | 139,046 | 156,582 |
| Past Lost Household Services.......... | 28,496 | 28,496 |
| Future Lost Household Services........ | 78,000 | 78,000 |
| TOTALS........................... | $1,020,495 | $1,099,407 |

Note:   All opinions expressed in this report are held to a reasonable degree of actuarial and economic certainty.

-8-

# ROYAL A. BUNIN, MBA

## Actuarial-Economic Consultant

Office:
BUNIN ASSOCIATES
The Wynnewood House, Suite 109
300 East Lancaster Avenue
Wynnewood, PA 19096
(610) 642-4700

Residence:
401 Conshohocken State Road
Bala Cynwyd, PA 19004
(610) 667-3570

## EDUCATION:

Master of Business Administration, MBA, 1990,
The Fox School of Business and Management, Department of Economics, Temple University.
Major: Economics, Finance and Statistics.

Bachelor of Business Administration, Cum Laude, 1988,
The Fox School of Business and Management, Department of Economics, Temple University.
Major: Economics; Minor Concentration: Mathematics and Statistics.

## CURRENT EMPLOYMENT:

### CONSULTING:

BUNIN ASSOCIATES: May 1, 1983 to the present.
General Partner since January 1, 1997.
Actuarial-economic consulting practice, providing services for the legal profession:

1) Initial analysis, subsequent research and development, and final preparation of written reports detailing past, current and projected economic losses.

2) Expert testimony on economic damages and expertise opinion regarding future projected losses.

3) Typical areas of concentration:

| | |
|---|---|
| Earning Capacity | Household Services |
| Fringe Benefits | Future Medical Costs |
| Retirement Benefits | Lost Profits |

Royal A. Bunin, M.B.A.                                    Page Two

## CURRENT EMPLOYMENT: (continued)

### TEACHING:

TEMPLE UNIVERSITY:
The Fox School of Business and Management, Department of Economics.
Adjunct Instructor. Initial Appointment: Fall, 1999
    Courses:    Introduction to Microeconomics, 3 Credit Hours.
                    Introduction to Macroeconomics, 3 Credit Hours.
                    Global Economic Issues, 3 Credit Hours.

ROWAN UNIVERSITY:
College of Liberal Arts and Sciences, Department of Economics.
Adjunct Instructor. Initial Appointment: Fall, 2000
    Courses:    Introduction to Microeconomics, 3 Credit Hours.

## PROFESSIONAL PRESENTATIONS:

Speaker at the *"Damages in a Wrongful Death Case"* CLE Seminar,
Presented by the Young Lawyers Committee and the Camden County Bar Association.

Speaker at the *"Economic Damages Round Table"* CLE Seminar,
Presented by the Association of Trial Lawyers of America-New Jersey Educational Foundation.

## PROFESSIONAL SOCIETIES:

1) American Economic Association
2) National Association of Forensic Economics
3) Philadelphia Estate Planning Council
4) Temple University, School of Business and Management, Alumni Association
5) American Academy of Economic and Financial Experts

## PROFESSIONAL DESIGNATIONS:

Academy Certified Diplomat, American Academy of Certified Consultants and Experts.

Royal A. Bunin, M.B.A.                                            Page Three

## COURT TESTIMONY:

Economic and actuarial testimony presented in the following jurisdictions:

1) Commonwealth of Pennsylvania Court System:
   (A) Pennsylvania Commonwealth Court, (Legislative Court).
   (B) Court of Common Pleas:

| | | |
|---|---|---|
| Adams County | Delaware County | Montgomery County |
| Berks County | Fayette County | Montour County |
| Bucks County | Franklin County | Northampton County |
| Cambria County | Lancaster County | Philadelphia County |
| Clinton County | Lehigh County | Schuylkill County |
| Chester County | Luzerne County | Washington County |
| Columbia County | Lycoming County | Wyoming County |
| Cumberland County | Mifflin County | York County |
| Dauphin County | Monroe County | |

2) U.S. District Court:
   Pennsylvania: Harrisburg, Philadelphia, Scranton, Williamsport
   Delaware: Wilmington
   New Jersey: Camden
   New York: New York City

3) U.S. Bankruptcy Court:
   Pennsylvania: Wilkes Barre

4) New Jersey State Superior Court:

| | | |
|---|---|---|
| Atlantic County | Cumberland County | Middlesex County |
| Bergen County | Essex County | Monmouth County |
| Burlington County | Gloucester County | Salem County |
| Camden County | Hudson County | Union County |
| | Mercer County | |

5) Delaware State Superior Court:          6) Maryland State Court:
   New Castle County                          Anne Arudel County
                                              Cecil County

7) Commonwealth of Massachusetts Superior Court:
   Suffolk County

8) New York State Supreme Court:

| | | |
|---|---|---|
| Bronx County | Nassau County | Orange County |
| Kings County | New York County | Queens County |
| Monroe County | Ontario County | |

Arbitrations and depositions in Pennsylvania, Maryland, New Jersey and New York

## DAVID T. BUNIN, FSA CLU

### Actuarial-Economic Consultant

Office:
BUNIN ASSOCIATES
The Wynnewood House, Suite 109
300 East Lancaster Avenue
Wynnewood, PA 19096
(610) 642-4700

Residence:
358 Williams Road
Wynnewood, PA 19096
(610) 896-8353

### EDUCATION:

B.A., University of Delaware, 1950. Mathematics, economics.

Fellow, Society of Actuaries, 1961. (Upon successful completion of required eight examinations, 1950-61, including topics of mathematics, investments, interest, life expectancy, statistics, productivity, growth factors, expense analysis, life insurance law, pensions, Social Security, etc.)

Chartered Life Underwriter 1972. (Upon successful completion of required ten college level examinations, 1965-72, including subjects of economics, finance, family budgeting, insurance, pensions, etc.)

Enrolled Actuary, Employee Retirement Income Security Act.

### CURRENT EMPLOYMENT:

Private actuarial-economic consulting practice, providing services for:

1) Legal profession (reports, testimony and consultation on lost earning capacity in injury and death cases, and measurement of retirement benefits in divorce proceedings.)

2) Insurance companies (annuity settlements)

3) Corporate and professionals (estate planning based on value of future earning capacity)

### PAST EMPLOYMENT:

1971-73. Associate Actuary, Penn Mutual Life Insurance Company, Philadelphia, PA (Product development, cost-of-living policy analysis, instruction)

1969-71. Consulting Actuary, Milliman & Robertson, Inc., Wayne, PA (Premiums, projections, valuations)

David T. Bunin, FSA, CLU                                              Page Two

## PAST EMPLOYMENT (and duties)
(continued)

1959-69.  Assistant Vice President and Actuary, Sun Life Insurance Company, Baltimore, MD.  (New policies, agency compensation, health insurance)

1954-59.  Associate Actuary, Baltimore Life Insurance Company, Baltimore MD.  (Manager of actuarial department, product development)

1953-54.  Assistant Actuary, State of Maryland Insurance Department.  (Analysis of policy forms, examinations of insurance companies)

1950-1953.  New York Life Insurance Company, New York, NY.  (Actuarial, accounting, underwriting and claim departments)

## PROFESSIONAL SOCIETIES:

Society of Actuaries  (by examination)

American Academy of Actuaries  (charter member)

American Economic Association

Middle-Atlantic States Actuarial Club  (former president)

Philadelphia Actuarial Club  (former chairman of education committee)

American Society of Chartered Life Underwriters

Conference of Consulting Actuaries

## TEACHING AND SEMINARS:

Lecturer at Seminars of Pennsylvania, Delaware and New Jersey  Trial Lawyers Association

Guest Lecturer, Temple University, School of Actuarial Science

Lecturer at Dickinson Law School Forum

Instruction of Actuarial and Insurance classes at insurance companies in Philadelphia and Baltimore

Chairman of Society of Actuaries seminar on "Actuaries in Court" at Waldorf Astoria, New York

David T. Bunin, FSA, CLU                                          Page Three

## GROUPS ADDRESSED ON ACTUARIAL AND ECONOMIC TOPICS

Defense Research Institute

Maryland Trial Lawyers Association

New Jersey Trial Lawyers Association

Pennsylvania Bar Institute

Pennsylvania Trial Lawyers Association

Philadelphia Association of Defense Counsel

Philadelphia Claim Association

Philadelphia Trial Lawyers Association

## PERIODICALS IN WHICH ARTICLES HAVE APPEARED:

The Shingle - Philadelphia Bar Association

The Barrister - Pennsylvania Trial Lawyers Association

Verdict - Philadelphia Trial Lawyers Association

The Florida Law Journal

## COURT TESTIMONY:

Economic and actuarial testimony presented for both plaintiffs and defendants:

1) Common Pleas Court of Philadelphia

2) Federal District Court, Philadelphia, PA

3) Federal District Court, Reading, PA

4) Federal District Court, Camden, NJ

5) Federal District Court, New York, NJ

6) Other State and Federal Courts in Pennsylvania, Delaware, Maryland, New Jersey, New York, Massachusetts, Connecticut, Virginia, West Virginia, Texas and Florida

# IN THE PHILADELPHIA COURT OF COMMON PLEAS

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

JUL 2 – 2007

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

IN RE: PAXIL

DOCKETED
COMPLEX LIT CENTER

JUL 2  2007

J. STEWART

OCTOBER TERM, 2004

NO.: 1503

:
:
:
:
:

## CASE MANAGEMENT ORDER NO. 3: GOVERNING ALL "ON-DRUG PAXIL" PERSONAL INJURY CASES ALLEGING SUICIDE OR SUICIDALITY WHILE TAKING PAXIL OR PAXIL CR

Plaintiffs' Liaison Counsel and Defendant's Liaison Counsel met and agreed on a trial plan and process to select a case for an on drug trial in the Fall of 2007. Plaintiffs' Liaison Counsel and Defendant's Liaison Counsel present this agreed to Order to the Court for approval. The Court, having considered the proposal, enters the following:

1.     The following eight pending cases are selected for inclusion into a pool of cases (the "Trial Pool") to work up for trial. Plaintiffs selected the following five cases: Steven Harter v. GSK, October Term 2005, No. 0639; David Martin v. GSK, July Term 2005, No. 1517; Hively v. GSK, February Term 2006, No. 1587; Zech v. GSK, November Term 2006, No. 0150; and Collins v. GSK, February Term 2007, No. 0762. Defendant selected the following three cases: Vestri v. GSK, May Term 2005, No. 3315; Leticia Martinez v. GSK, May Term 2005, No. 3314; and Turek v. GSK, September Term 2006, No. 3595. One of these eight cases will be selected for a trial set on or after November 7, 2007. The process for selecting the case for trial, and the order of the trials of the other seven cases, will be determined either by a mutually agreeable process or as determined by the Court. Selection of the case for the November 7, 2007

trial, and the order of the remaining seven cases for trial, will take place on or before August 6, 2007. All eight cases shall be subject to the deadlines in paragraph 2 and the case selected for trial shall be subject to the additional deadlines in paragraph 3 below.

        2.      The following deadlines shall apply to each of the eight cases selected in the Trial Pool:

> August 10, 2007: Deadline for Plaintiffs to serve general causation/liability and case-specific expert reports and disclosures;
>
> August 3, 2007: Close of fact discovery;
>
> August 6, 2007: Date for the Court to enter first trial choice and the order of the trials of the other seven cases in the Trial Pool;
>
> September 14, 2007: Deadline for Defendant to serve general causation and case-specific expert reports and disclosures; and
>
> September 28, 2007: Deadline for Plaintiffs to serve general causation/liability and case-specific expert reports and disclosures for rebuttal experts.

        3.      For the case selected for trial on or after November 7, 2007 trial, the following additional deadlines shall apply:

> August 10, 2007: Deadline for Plaintiffs to serve witness and exhibit lists (with exhibits) and deposition designations by page and line number;
>
> August 24, 2007: Deadline for Defendant to serve fact witness and exhibit lists (with exhibits) and deposition designations by page and line number;
>
> August 24, 2007: Deadline for Defendant's objections to Plaintiffs' exhibit list;
>
> September 1, 2007: Deadline to file dispositive motions;
>
> September 7, 2007: Deadline for Plaintiffs' objections to Defendant's exhibit list;

September 14, 2007: Deadline for Defendant to serve expert witness list;

September 14, 2007: Deadline to file oppositions to dispositive motions;

September 17, 2007: Deadline to file Frye motions on experts;

September 10, 2007: Deadline for Defendant's objections to Plaintiffs' deposition designations and counter-designations by page and line number (Plaintiffs' objections to counter-designations are preserved);

September 24, 2007:  Deadline for Plaintiffs' objections to Defendant's deposition designations and counter-designations by page and line number (Defendant's objections to counter-designations are preserved);

September 28, 2007: Deadline to file reply briefs in support of dispositive motions;

October 1, 2007: Deadline to file motions *in limine*;

October 15, 2007: Deadline to file oppositions to those Frye motions filed by September 17, 2007;

October 15, 2007: Deadline to file oppositions to motions *in limine*;

October 15, 2007: Demonstrative exhibit exchange;

October 22, 2007: Deadline to file reply briefs in support of motions *in limine*;

October 22, 2007: Deadline to file reply briefs in support of those Frye motions filed by September 17, 2007;

October 22, 2007: Deadline to file objections to demonstrative exhibits;

November 1, 2007: Start of jury selection;

November 1, 2007: Deadline to file proposed jury instructions; and

November 2, 2007: Hearing on pending motions; and

November 7, 2007: Case is trial ready and/or trial begins.

BY THE COURT

Tereshko, J.

Date: 6/29/07

POGUST & BRASLOW

Harris L. Pogust
Pogust & Braslow, LLP
One Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, PA 19428

*On behalf of all Plaintiffs*

DECHERT LLP

Joseph K. Hetrick
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

*Attorneys for Defendant SmithKline Beecham*
*Corporation d/b/a GlaxoSmithKline*

IN THE PHILADELPHIA COURT OF COMMON PLEAS

DOCKETED
COMPLEX LIT CENTER

AUG 2 1 2007

J. STEWART

IN RE: PAXIL

:
:
:
:
:
:
:

OCTOBER TERM, 2004

NO.: 1503

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

AUG 2 1 2007

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

## CONSENT ORDER REGARDING TRIAL ORDER OF CASES FROM TRIAL POOL IN CASE MANAGEMENT ORDER NO. 3

The parties, Plaintiffs and Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), having reached agreement on the order of the eight (8) cases listed in Case Management Order No. 3 ("CMO 3") as part of the Trial Pool, respectfully request the Court, pursuant to the terms of CMO 3, enter an order regarding trial cases as agreed by the parties. The agreement of the parties is as follows:

1.    Collins v. GSK, February Term 2007, No 00762 is the first case to be tried. Collins v. GSK, February Term 2007, No. 00762 is set for trial on or after November 7, 2007, as scheduled by the Court. All deadlines listed in paragraphs 2 and 3 of CMO 3 shall apply to the Collins case.

2.    For the Collins trial, Plaintiffs' deposition designations for Dr. Krall and Dr. Metz are due ten (10) days after their respective depositions. GSK's objections and counter-designations are due twenty (20) days after the respective depositions. Plaintiffs' objections to GSK's counter-designations are due five (5) days after service of GSK's counter-designations.

RECEIVED

AUG 2 7 2007

DAVID STANOCH

3.    The remainder of the cases listed in CMO 3 shall be subject to the provisions of

Paragraph 2 of CMO 3.  After the completion of the Collins trial, the remaining cases in the Trial

Pool shall be tried in the following order, as scheduled by the Court:

      a.    Martinez v. GSK, May Term 2005, No. 3314

      b.    Hively v. GSK, February Term 2006, 1587

      c.    Turek v. GSK, September Term 2006, No 3595

      d.    Martin v. GSK, July Term 2005, No 1517

      e.    Zech v. GSK, November Term 2006, No 00150

      f.    Harter v. GSK, October Term 2005, No 00639

      g.    Vestri v GSK, May Term 2005, No. 3315

4.    At an appropriate time, the parties shall submit to the Court a proposed schedule

for pre-trial and trial deadlines in these cases.

BY THE COURT

Tereshko, J.

Date: Aug 20, 2007

2

CONSENTED TO AND AGREED:

Sol H. Weiss
Anapol, Schwartz, Weiss,
Cohan, Feldman & Smalley, P.C.
1900 Delancey Place
Philadelphia, PA 19103

Harris Pogust
Pogust & Braslow LLC
161 Washington Street
Suite 1520
Conshohocken, PA 19428
On Behalf of Plaintiffs

Joseph K. Hetrick
Joshua G. Schiller
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia PA 19104

Attorneys for Defendant
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline

2

DECHERT LLP
By:     Joseph K. Hetrick (PA ID No. 46405)
        Joshua G. Schiller (PA ID No. 89144)
        David J. Stanoch (PA ID No. 91342)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)

Attorneys for Defendant
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline

---

| | |
|---|---|
| COLLINS, ET AL. : | **COURT OF COMMON PLEAS** |
| Plaintiffs, : | **CIVIL TRIAL DIVISION** |
| : | **PHILADELPHIA COUNTY** |
| v. : | |
| : | **February Term, 2007** |
| SMITHKLINE BEECHAM CORPORATION : | |
| D/B/A GLAXOSMITHKLINE, INC., : | NO. 000762 |
| Defendant. : | |

---

## COMMISSION and LETTER ROGATORY

To the Appropriate Judicial Authority in:     <u>Superior Court of District of Columbia
or other court of competent jurisdiction</u>

Whereas the above-captioned suit is pending before us, and it has been suggested to us

that the following non-party, non-Pennsylvania resident resides within your jurisdiction, without

whose testimony justice cannot completely be done between the said parties:

**David Voyles
Smithsonian Institution
MRC 1204
PO Box 37012
Washington, DC 20013-0712**

We therefore, request you that, in furtherance of justice, you will, by the proper and usual process of your Court, cause such person to appear for that purpose identified or pointed out to you by the said parties, or either of them, at a time and place by you to be fixed: and that you will cause their testimony to be committed to writing, and return to us under cover duly closed and sealed, together with these presents and other attendant documents; via subpoena ad testificandum, and accompanying subpoena duces tecum if necessary, or via appropriate device(s) utilized by you for compelling the appearance of a witness for deposition, with document if necessary: and we shall be ready and willing to do the same for you in a similar case when required.

*Joseph H. Evers*

**JOSEPH H. EVERS**

DECHERT LLP
By:     Joseph K. Hetrick (PA ID No. 46405)
        Joshua G. Schiller (PA ID No. 89144)
        David J. Stanoch (PA ID No. 91342)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)

Attorneys for Defendant
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline

---

| COLLINS, ET AL | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| Plaintiffs, | : | **CIVIL TRIAL DIVISION** |
| | : | **PHILADELPHIA COUNTY** |
| v. | : | **February Term, 2007** |
| SMITHKLINE BEECHAM CORPORATION | : | **NO. 000762** |
| D/B/A GLAXOSMITHKLINE, INC., | : | |
| Defendant. | : | 074136 |

---

**ORDER**

AND NOW, this 24th day of _July_, 2007, after consideration of

defendant's Unopposed Petition for the Issuance of a Commission and Letter Rogatory pursuant

to 42 Pa. C.S.A. § 5325 issue a commission and letter rogatory for GSK to obtain a subpoena ad

testificandum, and an accompanying subpoena duces tecum if necessary, or other appropriate

device(s) utilized by the local court for compelling the appearance of a witness for deposition,

with documents if necessary, it is hereby ORDERED as follows:

1.    The Petition is GRANTED.

**UNCONTESTED**

2.    The prothonotary is directed to issue a commission and letter rogatory in the above-captioned matter to the Superior Court of District of Columbia, or other court of competent jurisdiction, for the issuance of a subpoena ad testificandum, and accompanying subpoena duces tecum if necessary, or other appropriate device(s) utilized by the local court for compelling the appearance of a witness for deposition, with documents if necessary, for the deposition of the following non-party, non-Pennsylvania resident:

**David Voyles**
**Smithsonian Institution**
**MRC 1204**
**PO Box 37012**
**Washington, DC 20013-0712**

3.    This order and the commission and letter rogatory are intended to be that form of order, mandate, writ, commission, or letter pursuant to which the courts of the state wherein the above-named person resides may issue orders and process to compel the production of persons for deposition, along with documentary evidence if necessary.

BY THE COURT:



DOCKETED
COMPLEX LIT CENTER

JUL 2 4 2007

N. SWEENEY

COPIES SENT
PURSUANT TO Pa.R.C.P.236(b)

JUL 2 4 2007

FIRST JUDICIAL DISTRICT OF PA
N. SWEENEY

UNCONTESTED

# KING & SPALDING

1700 Pennsylvania Avenue, N.W.
Washington, DC  20006-4706
Phone: 202/737-0500
Fax:  202/626-3737
www.kslaw.com

Lauren S. Reeder
Direct Dial: (202) 661-7933
lreeder@kslaw.com

August 3, 2007

**VIA FACSIMILE**

Ms. Christine Nicholson
Associate General Counsel
Smithsonian Institution
P.O. Box 23286
Washington, D.C. 20026-3286

> Re:  **Bobby Collins v. GlaxoSmithKline**

Dear Ms. Nicholson:

Thank you again for meeting with me on Thursday, August 2, and for arranging that time for me to speak with Mr. McLaughlin, as well.  As I indicated was a likely possibility at our Thursday meeting, we intend to serve Mr. David Voyles with a subpoena seeking to obtain his deposition testimony in the above-referenced lawsuit.  When we do, we will certainly forward you a courtesy copy of that subpoena.

We appreciate your position that the Smithsonian will not comply with any subpoena served on Mr. Voyles by a state court, or similarly by the D.C. Superior Court, based on the doctrine of federal sovereign immunity, and, as such, that you do not intend to produce Mr. Voyles for a deposition in this matter.  We sincerely hope that we will not have to take this matter to motion practice, particularly given that we merely seek Mr. Voyles' fact testimony based on the fact that he knew Bobby Collins.  As I explained at our meeting, we only seek information based on Mr. Voyles' factual observations of, and general interactions with, Mr. Collins.  We do not intend to impinge on the practices, policies, or internal workings of the Smithsonian Institution in any way.  Moreover, we are more than willing to schedule the deposition at a time and place that is convenient to the witness to avoid interfering with the administration of his duties to the Smithsonian.  However, we understand that the Smithsonian Institution's position is that you will not present Mr. Voyles for a deposition prior to the August 3, 2007 close of discovery in this case.

Ms. Christine Nicholson
August 3, 2007
Page 2

Finally, our research has not revealed regulations enacted by the Smithsonian Institution that govern requests for an employee's testimony in private litigation. If there are such, we would appreciate knowing where we might obtain a copy.

Thank you for your cooperation in these matters. Please do not hesitate to contact me if you have any questions or would like to discuss these matters further.

Sincerely,

Lauren S. Reeder

cc:     Mr. Todd P. Davis
        Mr. Scott B. Pfahl
        Ms. Anne M. Carter
        Ms. Camille Goble

DECHERT LLP
By:     Joseph K. Hetrick (PA ID No. 46405)
        Joshua G. Schiller (PA ID No. 89144)
        David J. Stanoch (PA ID No. 91342)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)

Attorneys for Defendant
SmithKline Beecham Corporation d/b/a
~~GlaxoSmithKline~~ GlaxoSmithKline

RECEIVED
Civil Clerk's Office
AUG 1   2007

0005633-07

| | |
|---|---|
| COLLINS, ET AL. | **COURT OF COMMON PLEAS** |
| Plaintiffs, | **CIVIL TRIAL DIVISION** |
| | **PHILADELPHIA COUNTY** |
| v. | |
| | **February Term, 2007** |
| SMITHKLINE BEECHAM CORPORATION | **NO. 000762** |
| D/B/A GLAXOSMITHKLINE, INC., | |
| Defendant. | |

## COMMISSION and LETTER ROGATORY

To the Appropriate Judicial Authority in:     <u>Superior Court of District of Columbia
or other court of competent jurisdiction</u>

Whereas the above-captioned suit is pending before us, and it has been suggested to us

that the following non-party, non-Pennsylvania resident resides within your jurisdiction, without

whose testimony justice cannot completely be done between the said parties:

**David Voyles**
**Smithsonian Institution**
**MRC 1204**
**PO Box 37012**
**Washington, DC 20013-0712**

We therefore, request you that, in furtherance of justice, you will, by the proper and usual process of your Court, cause such person to appear for that purpose identified or pointed out to you by the said parties, or either of them, at a time and place by you to be fixed: and that you will cause their testimony to be committed to writing, and return to us under cover duly closed and sealed, together with these presents and other attendant documents; via subpoena ad testificandum, and accompanying subpoena duces tecum if necessary, or via appropriate device(s) utilized by you for compelling the appearance of a witness for deposition, with document if necessary: and we shall be ready and willing to do the same for you in a similar case when required.

JOSEPH H. EVERS

DECHERT LLP
By:    Joseph K. Hetrick (PA ID No. 46405)
       Joshua G. Schiller (PA ID No. 89144)
       David J. Stanoch (PA ID No. 91342)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000 (phone)
(215) 994-2222 (facsimile)

Attorneys for Defendant
SmithKline Beecham Corporation d/b/a
GlaxoSmithKline

---

| COLLINS, ET AL | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **CIVIL TRIAL DIVISION** |
| Plaintiffs, | : | **PHILADELPHIA COUNTY** |
| | : | |
| v. | : | **February Term, 2007** |
| | : | |
| SMITHKLINE BEECHAM CORPORATION | : | **NO. 000762** |
| D/B/A GLAXOSMITHKLINE, INC., | : | |
| | : | |
| Defendant. | : | **074136** |

---

### ORDER

AND NOW, this 24ⁿ day of _____July_____, 2007, after consideration of

defendant's Unopposed Petition for the Issuance of a Commission and Letter Rogatory pursuant

to 42 Pa. C.S.A. § 5325 issue a commission and letter rogatory for GSK to obtain a subpoena ad

testificandum, and an accompanying subpoena duces tecum if necessary, or other appropriate

device(s) utilized by the local court for compelling the appearance of a witness for deposition,

with documents if necessary, it is hereby ORDERED as follows:

1.    The Petition is GRANTED.

**UNCONTESTED**



2.    The prothonotary is directed to issue a commission and letter rogatory in the above-captioned matter to the Superior Court of District of Columbia, or other court of competent jurisdiction, for the issuance of a subpoena ad testificandum, and accompanying subpoena duces tecum if necessary, or other appropriate device(s) utilized by the local court for compelling the appearance of a witness for deposition, with documents if necessary, for the deposition of the following non-party, non-Pennsylvania resident:

**David Voyles**
**Smithsonian Institution**
**MRC 1204**
**PO Box 37012**
**Washington, DC 20013-0712**

3.    This order and the commission and letter rogatory are intended to be that form of order, mandate, writ, commission, or letter pursuant to which the courts of the state wherein the above-named person resides may issue orders and process to compel the production of persons for deposition, along with documentary evidence if necessary.

BY THE COURT:

_Allan L. Tereshko_
_____

DOCKETED
COMPLEX LIT CENTER

JUL 2 4 2007

N. SWEENEY

COPIES SENT
PURSUANT TO Pa.R.C.P.236(b)

JUL 2 4 2007

FIRST JUDICIAL DISTRICT OF PA
N. SWEENEY

UNCONTESTED

# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4706
Phone: 202/737-0500
Fax: 202/626-3737
www.kslaw.com

Lauren S. Reeder
Direct Dial: (202) 661-7933
lreeder@kslaw.com

August 16, 2007

**VIA FACSIMILE**

Ms. Christine Nicholson
Associate General Counsel
Smithsonian Institution
P.O. Box 23286
Washington, D.C. 20026-3286

Re:     **Bobby Collins v. GlaxoSmithKline**

Dear Ms. Nicholson:

As I indicated in my letter to you dated August 3, 2007, I am enclosing a courtesy copy of the subpoena that we have served on Mr. David Voyles that seeks his deposition testimony in the above-referenced lawsuit. Because I have not received a response to my August 3 letter, we assume that your position has not changed, and that the Smithsonian does not intend to present Mr. Voyles for deposition in response to any state or local court subpoena based on the Smithsonian's assertion of federal sovereign immunity.

On this issue, we wish to emphasize again that we sincerely hope we will not have to take this matter to motion practice before any court. GSK is merely interested in asking questions about the factual observations and information known to Mr. Voyles concerning Mr. Collins and the circumstances surrounding his death. GSK wishes to reiterate that it is not seeking information that impinges on the policies or internal workings of the Smithsonian Institution. GSK, of course, would not object to you attending the deposition, and, in the event that you, as counsel for the Smithsonian, objected to a particular question, that would be reserved for the Court to rule upon in the event that we could not resolve the issue at the deposition.

Moreover, as I explained in my earlier letter, we are more than willing to schedule the deposition at a time and place that is convenient to the witness to avoid interfering with the administration of his duties to the Smithsonian. Also, we anticipate the deposition will last approximately two (2) hours.

Please contact me in the event you are willing to discuss these issues further.

Sincerely,

*Lauren Reeder*

Lauren S. Reeder

Attachment
cc:     Mr. Todd P. Davis (w/attach.)
       Mr. Scott B. Pfahl
       Ms. Anne M. Carter
       Ms. Camille Goble (w/attach.)

**SUBPOENA**

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001     Telephone (202) 879-1133

| | |
|---|---|
| Collins, et al. | SUBPOENA IN A CIVIL CASE |
| _____ Plaintiff | |
| v. | |
| SmithKlineBeecham Corp. d/b/a GlaxoSmithKline, Inc. | CASE NUMBER: 0005633-07 |
| _____ Defendant | |

To: David Voyles
_____

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

| COURTROOM | DATE | TIME |
|---|---|---|
| | | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  L.A.D. Reporting 1100 Connecticut Ave., NW, Suite 850 Washington, DC  20036 | DATE August 29, 2007 | TIME 5:00 pm |
|---|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below *(list documents or objects)*:

| DOCUMENTS OR OBJECTS | | |
|---|---|---|
| | | |
| PLACE OF PRODUCTION | DATE | TIME |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE | TIME |
|---|---|---|
| | | |

　　　　Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. SCR-CIV 30(b)(6).

| ISSUING PERSON'S SIGNATURE AND TITLE (indicate if attorney for plaintiff or defendant) | DATE |
|---|---|
| Attorney for defendant  *Lauren Reeder* | 8-14-07 |

| ISSUING PERSON'S NAME, ADDRESS AND PHONE NUMBER     (202) 661-7933 |
|---|
| Lauren Reeder          1700 Pennsylvania Avenue, NW |
| King & Spalding LLP     Washington, DC  20006 |
|                          DC Bar # 494572 |

**(SEE RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE ON REVERSE)**

**WHITE—ORIGINAL     YELLOW—FOR RETURN SERVICE     PINK—OFFICE COPY**

Authorization as required by D.C. Code §14-307 and Brown v U.S., 567 A. 2d 426 (D.C. 1989), is hereby given for issuance of a subpoena for medical records concerning a person who has not consented to disclosure of the records and has not waived the privilege relating to such records.

_____
Judge To Whom Case Is Assigned

## PROOF OF SERVICE

| SERVED | DATE | TIME | PLACE |
|--------|------|------|-------|
|        |      |      |       |

SERVED ON (PRINT NAME)    MANNER OF SERVICE
(attach return receipt if service was made by registered or certified mail)

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the District of Columbia that I am at least 18 years of age and not a party to the above entitled cause and that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE, Sections C & D:

(c) **Protection of Persons Subject to Subpoenas.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The Court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this Rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the Court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the Court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance.

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 25 miles from the place where that person resides, is employed or regularly transacts business in person except that, subject to the provisions of clause (c)(3)(B)(iii) of this Rule, such a person may in order to attend trial be commanded to travel from any such place to the place of trial, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 25 miles to attend trial, the Court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the Court may order appearance or production only upon specified conditions.

(d) **Duties in Responding to Subpoena.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

be correlated with the risk of suicide attempts in his own research and that of his colleagues. Table 17.1 presents these factors.

A review of the recent published literature adds some additional variables to the list. These include EEG alpha asymmetry (Grace, Tenke, Bruder, & Rotheran, 1996); low self-esteem (Milling, Campbell, Bush, & Laughlin, 1996); low family support (Yuen, Androde, Nahulu, & Makine, 1996); cynicism (Nierenberg, Ghaemi, Clancy-Colecchi, & Rosenbaum, 1996); family conflicts (Arieli, Gilat, & Aychek, 1996); neuroticism, psychoticism, interpersonal aversiveness, anhedonia, hostility, and antisocial traits (Nordstroem, Schalling, & Asberg, 1995); low cholesterol levels in the blood (Wardle, 1995); stressfulness of life (Linsky, Bachman, & Straus, 1995); low blood glucose (Linnoila & Virkkunen, 1992); and frequent mobility and high assault behavior in adolescence (Juon & Ensminger, 1997).

In addition, several papers have added the following risk factors: exposure to family violence (Botsis et al., 1995), poor reality testing and sexual conflicts (Box 17.2) (Plutchik, Botsis, & van Praag, 1995), and dysthymia and self-debasement (Greenwald et al., 1994).

This list of 62 risk factors that has been compiled is itself surely incomplete. As new personality, situational, family, and historical variables are used in research, additional risk factors are likely to be found. One may ask, however, what practical or preventive implications stem from these findings?

**TABLE 17.1. Risk Factors for Suicide Attempts or Suicides**

1. Schizophrenia
2. Depression
3. Other mental illnesses
4. Personality disorders
5. Hopelessness
6. Number of life problems
7. Recent psychiatric symptoms
8. History of violent behavior
9. Accepting attitudes toward suicide
10. Impulsivity
11. Number of family problems
12. Number of physical symptoms
13. History of family violence
14. Coping style of avoidance
15. Coping style of help seeking
16. Persistent feelings of anger
17. Persistent feelings of resentment
18. Trait anxiety
19. Defense mechanism of regression
20. Defense mechanism of displacement
21. Suspiciousness
22. Rebelliousness
23. Aggressive behavior in one's mother
24. Rejection by one's father
25. Feelings of isolation and loneliness
26. Suicidal threats or attempts in close friends or relatives
27. Strong sex drive
28. A large number of medical and neurological disorders in members of one's family
29. Early loss of mother or father
30. Easy access to weapons
31. Previous psychiatric treatment
32. Alcohol abuse
33. Drug abuse
34. Family history of alcoholism
35. Severe impairment in physical health
36. Paranoid thinking (ideas of reference)
37. Homosexual life style
38. History of previous suicide attempts
39. Recent loss of a close attachment
40. Job problems
41. Low CSF 5-HIAA (low dietary intake of tryptophan)
42. EEG alpha asymmetry
43. Low self-esteem
44. Low family support
45. Cynicism
46. Family conflicts
47. Neuroticism
48. Psychoticism
49. Interpersonal aversiveness
50. Anhedonia
51. Hostility
52. Antisocial traits
53. Low cholesterol blood levels
54. Stressfulness of life
55. Low blood glucose
56. Frequent mobility
57. High assault behavior in adolescence
58. Exposure to family violence
59. Poor reality testing
60. Sexual conflicts
61. Dysthymia
62. Self-debasement

# PRACTICE GUIDELINE FOR THE
# Assessment and Treatment of Patients With Suicidal Behaviors

## WORK GROUP ON SUICIDAL BEHAVIORS

Douglas G. Jacobs, M.D., Chair

Ross J. Baldessarini, M.D.
Yeates Conwell, M.D.
Jan A. Fawcett, M.D.
Leslie Horton, M.D., Ph.D.
Herbert Meltzer, M.D.
Cynthia R. Pfeffer, M.D.
Robert I. Simon, M.D.

*Originally published in November 2003. A guideline watch, summarizing significant developments in the scientific literature since publication of this guideline, may be available in the Psychiatric Practice section of the APA web site at www.psych.org.*

strong support for the heritability of suicide risk that is separate from the heritability of risk factors such as mood disorders but that is still likely to be influenced by environmental factors.

### c) Adoption studies

A less commonly employed technique to separate genetic from shared environmental factors is to study outcomes for persons adopted from their biological families very early in life. For the study of suicide, this approach has been reported only three times, and each study used the same Danish health and vital statistics registers that included data for 5,483 adoptions in greater Copenhagen between 1924 and 1947 (376–378). When data for suicide were pooled across all studies, to include affectively as well as psychotically ill probands (376, 378), there was an approximately fivefold greater risk among biological than among adoptive relatives (20 of 543 subjects [3.68%] versus two of 263 subjects [0.76%]).

Later, the same American and Danish collaborators (378) compared all adoptees identified as having an affective spectrum disorder (N=71) with matched control adoptees without such disorders (N=71). The index disorders included not only DSM-III major depression and bipolar disorder but also milder "neurotic" depressions and a condition ("affect reaction") marked by affective instability that may resemble some forms of personality disorder in current classifications. In relatives of affectively ill adopted probands, there was a significant, approximately sevenfold greater risk for suicide in biological relatives, compared with adopted relatives (15 of 387 subjects [3.88%] versus one of 180 subjects [0.56%]). Further analysis of the suicide rate for biological relatives, compared with control subjects, also yielded a highly significant 13.3-fold difference (15 of 387 subjects [3.88%] versus one of 344 subjects [0.29%]) (378). In striking contrast, however, when suicide attempts were considered separately, there was a 1.16-fold lower but nonsignificant risk in the biological relatives, compared with the adoptive relatives, of affectively ill adopted probands (13 of 387 subjects [3.36%] versus seven of 180 subjects [3.89%]). A similar comparison of the rate of suicide attempts in biological relatives of adopted probands and in matched but not affectively ill control subjects showed a modest 2.89-fold difference that failed to reach significance (13 of 387 subjects [3.36%] versus four of 344 subjects [1.16%]). Among relatives of index adoptees with a diagnosis of schizophrenia, there was a nonsignificant 2.67-fold greater risk for suicide in biological relatives, compared with adoptive relatives (five of 156 subjects [3.20%] versus one of 83 subjects [1.20%]) (376).

Matched comparison of 57 early-adopted individuals who died by suicide with other adoptees lacking evidence of suicide or psychiatric illnesses also showed a great excess risk of suicide in biological over adoptive relatives (12 of 269 subjects [4.46%] versus none of 148 subjects [0.00%]) (378). Risk of suicide was approximately sixfold greater in relatives of suicidal probands compared to relatives of matched, nonsuicidal control subjects (12 of 269 subjects [4.46%] versus two of 269 subjects [0.74%]). However, this study did not consider the possible coincident heritability of clinical risk factors for suicide, such as major affective illnesses and substance use disorders.

Overall, these adoption studies indicate a greater risk of suicide, but not of suicide attempts, among biological relatives of suicidal probands, compared with adoptive relatives. They also show greater risk among biological relatives of probands, compared with control subjects, that is consistent with the hypothesis that suicidality is heritable. Given the broader range of severity and lethality of suicide attempts and the greater likelihood of environmentally determined actions in many instances, the heritability of suicide may well be much greater than that of suicide attempts.

### 7. Psychosocial factors

#### a) Employment

Unemployment has long been associated with increased rates of suicide (379, 380, 726). Furthermore, the link between suicide and unemployment has been confirmed by a recent study

that used U.S. National Longitudinal Mortality Study data to assess whether unemployed individuals were at greater risk for suicide than employed persons (24). At 2-year follow-up, unemployed men were two to three times more likely to have died by suicide, compared with employed men. Living alone, being divorced, and having lower socioeconomic status increased the suicide risk. At or beyond 4 years of follow-up, however, there was no statistical association between unemployment and suicide for men. For women, the relationship between suicide and unemployment was even stronger and longer-lasting. Unemployed women had a much higher risk for suicide at each year of follow-up than employed women. Unemployed women continued to show an elevated risk at 9-year follow-up, by which time they were three times as likely to die by suicide as employed women. As with men, younger unemployed women were more at risk than women over age 45 years. While the number of women who died by suicide was small, the results remain significant and powerful. While in the past men were considered most at risk for suicide after becoming unemployed, it is now known that women are at an even greater risk and for a longer period of time. The relationship between unemployment, suicide, and psychiatric disorders remains unclear. Persons with psychiatric disorders may be more likely to quit jobs or to be fired as well as more likely to die by suicide (727).

Areas with socioeconomic deprivation also have larger numbers of unemployed people, and these differences have been used to examine effects of unemployment on rates of suicide and suicide attempts. Hawton et al. (386), for example, analyzed data for different wards, or communities, within Oxford, England, and found that wards with the highest socioeconomic deprivation were associated with the highest rates of suicide attempts. Individuals who attempted suicide, both men and women, were more likely to be unemployed, living alone, and having problems with housing. For men, but not for women, a strong association was also found between the rate of suicide attempts and socioeconomic deprivation. Men living in less deprived areas who had financial problems were even more likely to attempt suicide, suggesting that the dissonance between one's own financial status and that of the neighborhood may affect risk. Unemployment and financial problems can affect suicide in other ways as well. Alcohol consumption and marital conflict, each of which increases with financial difficulties or unemployment, may also contribute to increased risk for suicidal behaviors.

Political context and large-scale economic changes can also influence suicide and may provide clues about the effect of employment status on suicide rates. During times of war, for example, suicide rates decline (728), whereas increased suicide rates are found in political systems associated with violence or social movements. Areas of the former Soviet Union with high levels of sociopolitical oppression (i.e., Baltic States) have had higher suicide rates than other regions with less oppression (729). From an economic standpoint, research on the business cycle and suicide has relied primarily on unemployment rates, but other indicators include growth rates of the gross domestic product, the Ayres index of industrial activity, change in the stock market index, and the rate of new dwelling construction (730). Especially for men, the data suggest that the greater the prosperity, the lower the suicide rate, and, conversely, the greater the trend toward recession, the greater the suicide rate. During periods of high unemployment, such as the Great Depression, the relationship of unemployment to suicide is strengthened (731). However, studies using the Ayres index of industrial activity and monthly suicide trends have suggested that large swings in industrial production, such as those that occurred during the 1930s, are needed to influence the suicide rate (732).

In summary, it is important to ascertain the patient's employment status as part of the assessment process, since unemployment may increase suicide risk, whereas employment may offer some protection against suicide and suicide attempts. However, a patient's job status should also be considered in terms of other psychosocial stressors that may be related to job loss, such as financial or marital difficulties. In addition, there is often a complex interplay between employment status and psychiatric illness, including substance use disorder, that may influence treatment planning.

### b) Religious beliefs

Limited evidence points to religion as a protective factor against suicide. Pescosolido and Giorgianna (733) used suicide rates from the National Center for Health Statistics, data on affiliation rates in various Christian denominations from the National Council of Churches, and data on Jewish affiliation from the American Jewish Yearbook to determine whether suicide rates differ according to religious affiliation. They found that religion affected suicide rates, with Catholicism, Evangelical Protestantism, and membership in Church of the Nazarenes being associated with lower rates and Jewish affiliation producing a small but inconsistent protective effect. In contrast, various denominations of mainstream Protestantism tended to be associated with increased suicide rates.

Within specific religious denominations, the strength of religious belief may also play a role. Maris (394) compared suicide rates among Catholics and Protestants in Chicago between 1966 and 1968. Scores on church attendance, perception of religiosity, and influence of religion were negatively associated with suicidal ideation. After controlling for the effects of confounding variables such as sex, marital status, and socioeconomic status, Maris found that the perceived influence of religion was the most significant correlate of suicidal ideation. In immigrants from Central America, infrequent church attendance and low levels of perceived influence of religion were related to high levels of suicidal ideation (43). Thus, religious involvement may serve as a protective factor against suicide, either by helping to buffer acculturative stress (43) or by enhancing social networks and support (733).

In summary, some evidence suggests that religious beliefs and the strength of those beliefs may offer protective effects in relation to suicide risk. At the same time, these protective effects neither are specific to particular religious denominations nor are invariably present. Indeed, for some individuals, religious beliefs or beliefs about death may increase rather than decrease the likelihood of acting on suicidal thoughts. Consequently, the clinician may wish to gain an understanding of the patient's specific religious beliefs and the depth of the patient's religiosity as well as determine the ways in which these beliefs influence the patient's conceptions of death and suicide.

### c) Psychosocial support

Although it is often difficult to distinguish perceived from objective measures of social support, available data strongly suggest that the presence of a social network is a powerful and independent predictor of suicide risk. In particular, those who have (or perceive themselves to have) supportive interpersonal relationships are at lower risk for suicide than those without such actual or perceived supports. Rubenowitz et al. (405) used the psychological autopsy method to compare 85 persons age 65 years and older who died by suicide with 153 age- and sex-matched living persons selected from the tax roster in Gothenburg, Sweden. In addition to identifying a powerful influence of psychiatric disorders, they found that family discord was a significant risk factor for those who died by suicide (odds ratio≈19). Further, being active in a social club was a significant protective factor for both men and women. Another recent psychological autopsy study compared 53 individuals age 55 years and older who had either died by suicide or made a serious suicide attempt with 269 matched control subjects (403). Psychiatric illness was again a powerful predictor of suicide case status, but, in addition, those who died by suicide had significantly fewer social interactions and significantly more relationship problems, compared to the control subjects. Turvey and colleagues (400) used data from the Established Populations for Epidemiologic Studies in the Elderly database to identify 21 elderly persons who died by suicide over a 10-year follow-up period and compared those subjects to 420 control subjects matched for age, sex, and study site. In addition to depressive symptoms, poor perceived health status, and poor sleep quality, the absence of a relative or friend in whom to confide was a significant risk factor for late-life suicide. Finally, Miller (399) compared 30 men age 60 years and older who died by suicide with 30 men, matched on age, race, marital status, and county of residence, who died of natural causes. He reported that the control subjects were sig-

**118**                                                          *APA Practice Guidelines*



nificantly more likely to have had a confidante and that the subjects who died by suicide had significantly fewer visits with friends and relatives. Thus, while social support is a complex construct and the data on this factor come primarily from elderly populations, decreases in measures of social support appear to increase suicide risk, and, conversely, increases in social support may serve as a protective factor in relation to suicide.

**d)   Reasons for living, including children in the home**

An additional protective factor against suicide is the ability to cite reasons for living, which often reflect the patient's degree of optimism about life. Malone et al. (231) assessed 84 patients, 45 of whom had attempted suicide, to determine whether "reasons for living" might protect or restrain patients with major depression from making a suicide attempt. Depressed patients who had not attempted suicide were found to have expressed more feelings of responsibility toward their families, more fear of social disapproval, more moral objections to suicide, greater survival and coping skills, and a greater fear of suicide than the depressed patients who had attempted suicide. Although objective severity of depression and quantity of recent life events did not differ between the two groups, scores for hopelessness, subjective depression, and suicidal ideation were significantly higher for the suicide attempters.

Particularly in women, the presence of children in the home is an additional factor that appears to protect against suicide. Hoyer and Lund (26) used data from the Norwegian Central Bureau of Statistics to prospectively follow 989,949 women over a 15-year period. During that time there were 1,190 deaths from suicide, with parous women of all ages having lower relative risks than nonparous women (relative risk=0.4–0.8, depending on age). For both premenopausal and postmenopausal women, a strong linear decrease in relative risk for suicide was found with an increasing number of children.

Consequently, during the assessment and treatment planning process, clinicians should discuss reasons for living with at-risk patients and the need to develop coping skills that may serve as protective factors during periods of high risk for suicide.

**e)   Individual psychological strengths and vulnerabilities**

A number of personality traits and characteristics have been associated with suicide and suicidal risk and behaviors. Conner et al. (217) reviewed the literature on psychological vulnerabilities to suicide, including 46 publications describing 35 distinct case-control or cohort samples, and found no evidence for a link between suicide and guilt or inwardly directed anger. They did find that suicide was consistently associated with five constructs—impulsivity/aggression, depression, hopelessness, anxiety, and self-consciousness/social disengagement. Although other factors often moderate the relationships between these variables and suicide, they are not always interpretable in the literature because of measurement and definitional issues. Nonetheless, psychological vulnerabilities likely influence suicide risk by exacerbating other psychiatric or social risk factors in individual patients.

A number of other concepts have also been explored in relating suicide to individual vulnerabilities. For example, Duberstein (423) used questionnaires to assess personality dimensions in 81 depressed patients over age 50 and found that individuals who reported lower levels of openness to new experiences were less likely to report suicidal ideation. These findings are consistent with other work, suggesting that elderly persons tend to deny suicidality, whereas younger persons tend to exaggerate it. These findings may also provide support for the protective role of expressing suicidal ideation. Thus, when closed-minded people do come into contact with treatment services, their psychiatric symptoms may not be as obvious and their need for treatment may not be appreciated.

Hughes and Neimeyer (422) assessed 79 hospitalized psychiatric patients, 91% of whom had a principal diagnosis that included depression, and examined the utility of several cognitive

variables as predictors of suicidal ideation. Level of pessimism, as measured by the Hopelessness Scale, was the best predictor of subsequent suicidal ideation and was reliably related to placement on either one-to-one observation or every-15-minute checks for suicide precautions. In addition, hopelessness, self-negativity, polarization (all-or-nothing thinking), and poor problem-solving performance were associated with suicidal ideation, whereas self-evaluated problem-solving ability was not. A low level of constriction was related to the intensity of subsequent suicidal ideation and to later suicide attempts.

Josepho and Plutchik (409) investigated the relationship between interpersonal problems, coping styles, and suicide attempts in 71 adult psychiatric inpatients. Patients who were hospitalized after a suicide attempt had more interpersonal problems and also had distinct patterns of coping methods, including more use of suppression and substitution and less use of replacement. These coping styles were also associated with higher scores on a rating of suicide risk. After controlling for the effect of interpersonal problems, the authors found that greater suppression, less minimization, and less replacement were significantly related to increased suicide risk scores. The higher the risk score, the greater the likelihood that the patient was admitted to the hospital secondary to a suicide attempt. Depressed patients also had higher suicide risk scale scores.

Stravynski and Boyer (401) collected data from 19,724 persons who returned the Quebec Health Survey and tested whether there was an association between loneliness and suicidal thoughts or behaviors in the general population. A significant correlation was found between experiencing suicidal ideation or attempting suicide and living alone, having no friends, or feeling alone, with psychological distress being the strongest correlate of suicidal ideation. Of individuals who were severely distressed and very lonely, 25% reported serious suicidal ideation or actions. Overall, thoughts of suicide were reported by 3.1% of the population, and 0.9% had attempted suicide.

Maser et al. (247) examined the correlations between suicide and clinical and personality factors in 955 depressed patients who were followed over 14 years as part of the NIMH Collaborative Program on the Psychobiology of Depression. During that time, 3.8% died by suicide and 12.6% attempted suicide. Suicide within 12 months of intake to the study was associated with clinical variables, including emotional turmoil plus depression in the index episode, a history of both alcohol and drug use disorders, and meeting the criteria for antisocial personality disorder. Additional predictors included hopelessness, delusions of grandeur, indecisiveness, definite delusions or hallucinations during the index episode, reduced functional role, dissatisfaction with life, or any prior history of serious suicide attempts as of the intake episode. Beyond 1 year after intake, suicide was associated with temperamental factors, including high levels of impulsivity and shyness and low sanguinity scores. Suicide attempters and those who died by suicide shared core characteristics, including previous attempts, impulsivity, substance abuse, and psychic turmoil within a cycling/mixed bipolar disorder.

Kaslow et al. (413) conducted an empirical study of the psychodynamics of suicide among 52 patients hospitalized for a suicide attempt and 47 psychiatrically hospitalized control subjects with no history of suicidal behaviors. Overall, 49% of the subjects had depression, 25% had substance use disorders, and 63% had a cluster B personality disorder. Individuals who had attempted suicide were significantly more likely to report childhood loss combined with adulthood loss. Furthermore, they had more impairment in their object relations and viewed relationships in a more negative manner, showing lower levels of individuation and separation. Although self-directed anger was associated with homicidal ideation, there was little support for the psychodynamic concepts that depression, self-directed anger, or ego functioning would be associated with having made a suicide attempt.

In a group of 438 undergraduate college students who ranged in age from 16 to 65 years, Boudewyn and Liem (734) compared low and high scorers on a chronic self-destructiveness scale that measured behaviors such as chronic gambling or unsafe sexual behaviors that had a potential for later negative consequences. Overall, those scoring high in self-destructiveness

were younger and reported more childhood and adulthood maltreatment, lower self-esteem, greater depression, greater externality, less need for control in interpersonal relationships, and more frequent suicidal and self-injurious thoughts and acts. These findings suggest that other manifestations of self-destructiveness should be assessed in the individual evaluation of the suicidal patient and that childhood and adult maltreatment should be specifically identified and addressed in the treatment planning process.

Together with extensive clinical observations on individual strengths and vulnerabilities as they relate to suicidality (410, 412, 420, 426), research on various psychological dimensions has demonstrated the need to include such features in assessing suicide risk. In particular, personality traits such as aggression, impulsivity, social disengagement and subjective loneliness, hopelessness, anxiety, low self-esteem (and protective narcissism), dependence, ambivalence, and depression may increase risk for suicidal behaviors. Thinking styles such as closed-mindedness or polarized (either-or) thinking may also augment risk. If dilemmas are seen only in black-and-white terms, with fewer perceived options, patients may see no solution to their problems other than suicide. In addition to personality traits and thinking style, an individual's psychological needs, when not met, can cause intense psychological pain, contributing to a suicidal state. Early trauma and loss may thwart the development of healthy coping skills. In addition, individual perceptions of interpersonal supports, particularly subjective perceptions of loneliness, may also contribute to suicide risk. Thus, in weighing the strengths and vulnerabilities of the individual patient and developing and implementing a plan of treatment, it is helpful to assess the patient's past response to stress, vulnerability to life-threatening affects, available external resources, perceived sense of loneliness, fantasies about death, and capacity for reality testing and for tolerating psychological pain.

## 8. Degree of suicidality

### a) Presence, extent, and persistence of suicidal ideation

Suicidal ideation is common, with an estimated annual incidence of 5.6% (2). Kessler et al. (427) examined the lifetime prevalence of suicidal ideation and suicide attempts in a sample of 5,877 individuals age 15–54 years as part of the National Comorbidity Survey. The estimated lifetime prevalences of suicidal ideation, plans, and attempts were 13.5%, 3.9%, and 4.6%, respectively. The cumulative probability of moving from suicidal ideation to an unplanned attempt was 26%. The corresponding cumulative probability for transitioning from suicidal ideation to suicidal plans was 34%, with a 72% cumulative probability for going from a suicide plan to an attempt. About 90% of unplanned attempts and 60% of planned first attempts occurred within 1 year of the onset of suicidal ideation, suggesting a need for aggressive aftercare and attention to potentially modifiable risk factors in individuals with suicidal ideation.

Longitudinal studies also demonstrate an increased risk of eventual suicide in patients with suicidal ideation. Among 6,891 psychiatric outpatients who were followed for up to 20 years, Brown et al. (78) found that patients' scores on clinician-administered measures of current suicidal ideation and depression were most closely associated with eventual suicide. Fawcett et al. (79), using a case-control method to determine time-related predictors of suicide among 954 patients with major affective disorder, examined suicidal ideation as one possible predictor of actual suicide over a 10-year period. They found that the presence of suicidal ideation was associated with an increased risk for suicide on a long-term basis but not within the first year after study entry.

Others have examined the association between eventual suicide and suicidal ideation at its worst using the Scale for Suicide Ideation–Worst (SSI–W) (428). In a group of 3,701 outpatients in which there were 30 suicides, patients who scored in the high-risk category on the SSI–W had a rate of later suicide that was 14 times greater than that of the patients in the low-risk category. After controlling for the effects of other factors, the investigators found that only the SSI–W score, and not the scores on measures of current suicidal ideation or hopelessness,

was associated with future suicide (428). Consistent with the findings of Clark and Fawcett (273), the authors concluded that retrospective report of suicidal ideation at its worst may be a better predictor of suicide than currently reported suicidal ideation.

Intuitively, since suicidal ideas would be expected to precede suicidal intent or suicidal acts, they may serve as a guide for clinicians in identifying and addressing suicide risk. These studies also suggest that past as well as current suicidal ideation is relevant to the assessment process. However, since the vast majority of individuals with suicidal ideation do not die by suicide, additional factors are likely to be modulating suicide risk even in individuals with suicidal ideas.

### b)  Presence of a suicide plan and availability of a method

As noted earlier, about one-third of individuals with suicidal ideas go on to develop a suicide plan, and about three-quarters of those with a plan eventually make a suicide attempt. Other individuals, however, go on to attempt suicide in an unplanned manner. Thus, the presence of a suicide plan signifies that the risk of a later attempt is increased, but it by no means indicates that an attempt will occur or even the time frame within which an attempt may occur. By the same token, the absence of a suicide plan does not eliminate suicide risk. In general, however, the presence of a specific plan involving an available method is associated with a greater degree of risk for suicide. In addition, availability of methods with relatively high levels of lethality may increase the likelihood that a suicide attempt, either planned or impulsive, will result in suicide.

A number of studies have examined population-based trends in suicide rates as they relate to the availability of specific methods for suicide. Ohberg et al. (735), for example, evaluated trends in suicide rates and availability of methods used for suicide in Finland from 1947 to 1990. For both sexes, the overall suicide rate in Finland rose significantly in that time period, but method-specific rates of suicide varied. For example, the rate of suicide by using the highly lethal pesticide parathion decreased after its availability was restricted, but this decrease was offset by an increased rate of suicide by other methods. Before 1962, most suicides occurred by hanging or drowning, but after 1963, there was a rapid increase in the use of firearms. Coincident with increases in the availability of antidepressants and neuroleptics, the rates of suicide by overdose of these medications increased. There was a high number of overdoses of tricyclic antidepressants, which accounted for most of the deaths attributed to antidepressants. On the other hand, the number of overdose deaths attributed to nontricyclic antidepressants decreased, despite increased availability, and the number of overdose deaths attributed to barbiturates remained stable despite reduction in their availability.

Gunnell et al. (436) investigated method-specific trends in suicide between 1950 and 1975 in England and Wales. In the 1950s and early 1960s, domestic gas poisoning was the most frequently used method of suicide among men and women, accounting for one-half of all suicides. Changes in domestic gas supply and manufacture resulted in a reduction in its carbon monoxide content and thus lethality, and overall suicide rates declined in men and women of all ages. In women and younger men (younger than age 55 years), the effects of these reductions on overall suicide rates were partially offset by a rise in the rates of drug overdose deaths, but there were no immediate increases in the use of other suicide methods. In older men, a reduction in the rate of suicide by gassing was accompanied by only a slight increase in the rate of suicide by overdose as well as reductions in rates of suicide by using all other methods.

Marzuk et al. (437) investigated the relationship between the availability of lethal methods of injury and suicide rates by prospectively classifying lethal methods according to their accessibility in the five counties of New York City over a 4-year period and then comparing the age- and gender-adjusted method-specific suicide rates of the counties. During the study period, there were a total of 2,820 suicides, a rate of 9.81 per 100,000 persons. The study found marked differences in overall crude suicide rates among the five counties, which ranged from 15.27 per 100,000 persons in Manhattan to 5.58 per 100,000 persons in Staten Island. The counties had similar suicide rates involving methods that were equally accessible to all persons in each county

(e.g., hanging, laceration, suffocation, and burns) as well as methods that were accessible to a smaller but similar proportion of the population in each county (e.g., firearms and drowning in waterways). Virtually all of the differences in overall suicide risk among the counties were explained by methods that were differentially available, such as fall from height, overdose of prescription drugs, and carbon monoxide poisoning (explained by access to private parking). The availability of a greater variety of alternative lethal methods in some counties did not suppress the rates of use of other methods, and a relative lack of the availability of a specific method did not result in a comparative increase in the rates of use of alternative methods that were available, as the substitution hypothesis would have predicted. Thus, restriction of the availability of a method may reduce its use for suicide, but other methods may tend to be used instead. At the same time, the accessibility to and lethality of particular methods of suicide may have definite effects on the overall suicide rate.

In the United States, firearms constitute the most common method for suicide (736, 737). Fox et al. (738) used mortality data for 1979–1994 from the Wisconsin Center for Health Statistics and the U.S. Census Bureau population estimates for Wisconsin to describe trends for firearm-related suicides in that state. During that period, there were an average of 588 suicides annually, with firearms eclipsing all other methods combined as the most common method of suicide in the 1980s. Between 1981 and 1992, the proportion of firearm suicides increased from 48% to 57%. While the overall suicide rate remained unchanged over the period, the firearm suicide rate increased 17% in all sex, race, and age categories. Among males, the firearm-related suicide rate rose by 13% during the study period, while the rate of suicide by all other methods combined fell 12%. In comparison, among females, the firearm-related suicide rate rose 20%, and the rate of suicide by all other methods fell 26%.

Kaplan and Geling (434) investigated the sociodemographic and geographic patterns of firearm suicides in the United States using mortality data from the National Center for Health Statistics Mortality detail files and death certificate files reported by each state from 1989 to 1993. During this time period, 59.2% of the 139,566 suicides were by firearms. Married persons had the lowest rate of any form of suicide across all race, sex, and age groups. The adjusted odds of using firearms increased with age among men and decreased with age among women. Widowed men and married women had the highest odds of using firearms, and the odds of using a firearm for suicide were also high among those without college education, those who had lived in nonmetropolitan areas, and those who had lived in the East South Central and West South Central geographic divisions. Rates of nonfirearm suicides were higher than firearm suicides everywhere but in the regions of the South. Thus, the likelihood of firearm suicide varied significantly across sociodemographic and geographic subgroups of the U.S. population and paralleled variations in gun ownership, suggesting that regional cultural factors may account for differential rates in suicidal behavior involving firearms.

In addition to population-based data on firearm availability and suicide risk, some data also suggest an effect at an individual level. Brent et al. (438) performed a case-control study to determine the relationship between the presence of guns in the home, the type of gun, the method of storage, and the risk of suicide among adolescents. Forty-seven adolescents from the community who died by suicide were compared with two control groups from a psychiatric hospital: 47 patients who attempted suicide but survived and 47 patients who had never attempted suicide. The study found that guns were twice as likely to be found in the homes of those who died by suicide as in the homes of the suicide attempters or psychiatric control subjects. There was no significant difference in association with suicide between handguns and long guns, and there was no difference in the methods of storage of firearms among the groups. The authors concluded that the availability of guns in the home, independent of the type of firearm or storage method, appears to increase the risk for suicide, at least among adolescents.

In summary, the presence of a suicide plan and the availability of a method for suicide increase risk and are important issues to address as part of the suicide assessment. Since firearm-

related suicides account for a significant fraction of suicides in the United States, the presence and availability of firearms are also an important line of inquiry in a suicide risk assessment. A debate remains over whether a reduction in the availability of a particular method of suicide reduces overall risk, although most evidence indicates that restrictions on the availability of particular types of popular methods result in a lower overall suicide rate. At the individual level, reducing access to specific suicide methods may also be indicated. See Section II.C.2, "Elicit the Presence or Absence of a Suicide Plan," for additional discussion of inquiries, removal, and documentation issues related to firearms and the suicidal patient.

### c) Lethality and intent of self-destructive behavior

In addition to being increased by the presence of suicidal ideation, a suicide plan, or an available suicide method, suicide risk is also influenced by the patient's subjective expectation and desire to die as a result of a self-inflicted injury. This factor has generally been termed suicidal intent, although the patient's subjective expectation may or may not correspond to the lethality of an attempt made by using a given method. Other facets of a suicide plan or attempt that are often considered when estimating suicidal intent include the severity and potential lethality of the suicide attempt or aborted suicide attempt, the patient's degree of premeditation, whether precautions were taken to avoid intervention or discovery, and whether the patient's intentions were communicated to others (263, 433, 440).

Several studies have longitudinally assessed the influence of suicidal intent on later suicide risk. In a group of 500 patients who had completed a scale measuring suicidal intent after an episode of self-injury, Pierce (441) found that the seven individuals who had died by suicide by the time of a 5-year follow-up tended to have high suicidal intent scores at the time of their initial self-injury. In addition, individuals with increasing levels of suicidal intent with repeated self-injury appeared to be at greater risk for further repetition of self-injury (739). Suokas et al. (271) also conducted a longitudinal assessment of the effect of suicidal intent on suicide risk. They found that 68 (6.7%) of 1,018 deliberate self-poisoning patients had died by suicide by 14-year follow-up. Risk factors for suicide included being male, having previous psychiatric treatment or suicide attempts, having a somatic disease, and having a genuine intent to die at the time of the index self-poisoning.

Thus, for any patient with suicidal ideation, it is important to determine suicidal intent as part of the assessment process. In addition, for any patient who has made a prior suicide attempt, the level of intent at the time of the previous attempt should be determined.

### 9. Weighting of risk factors in suicide prediction

As noted previously, it is impossible to accurately predict suicide. Nevertheless, given the large number of risk factors and protective factors that can affect the likelihood of suicide, a number of statistical models have been developed to attempt to pinpoint which patients may be at greatest risk. In a longitudinal study by Pokorny (160) that followed 4,800 subjects (4,691 males and 109 females) over a 5-year period, stepwise discriminant analysis was used to select a weighted combination of predictive variables from the identified high-risk characteristics, i.e., being a white male; being single; having a diagnosis of affective disorder, schizophrenia, or alcoholism; having made a previous suicide attempt; or having personality disorder-related traits such as manipulativeness and hostility. This method was able to correctly identify 30 of the 67 subjects who died by suicide but also falsely predicted suicide in 773 individuals. Thus, while it may be possible to identify a high-risk group of patients who warrant more detailed clinical screening, it may not be possible to identify the particular individuals at greatest risk.

Goldstein et al. (740) also used a statistical model that incorporated multiple risk factors for suicide and applied it in a group of 1,906 patients with affective disorders who were admitted to a tertiary care hospital and were followed longitudinally. The identified risk factors included the number of prior suicide attempts, the presence of suicidal ideation on admission, gender,

**124**

outcome at discharge, and a diagnosis of either bipolar affective disorder (manic or mixed type) or, in individuals with a family history of mania, unipolar depressive disorder. The full statistical model, however, was unable to identify any of the patients who died by suicide, highlighting the difficulty of estimating suicide risk with such methods.

In general, statistical models may be valuable in the epidemiological and research arenas by identifying factors that distinguish high-risk populations of patients. They can also suggest clinically important risk factors that, if identified, are potentially amenable to treatment. However, given the low base rates of suicide in the population, accurate prediction of suicide remains impossible, regardless of the complexity of the statistical model used. Consequently, the psychiatric assessment, in combination with clinical judgment, is still the best tool for assessing suicide risk. In addition, intervention must be based not on the simple presence of risk factors as identified by statistical models but on the interaction of those factors with the individual patient's personal and clinical manifestations and the clinician's assessment of the patient's risk at that particular point in time.

## B. PSYCHIATRIC ASSESSMENT TECHNIQUES

### 1. Rating scales

A wide variety of self-report and clinician-administered scales are available that measure various aspects of suicidal thoughts and behaviors as well as symptoms associated with suicide. These scales are reliable and have adequate concurrent validity, and they may have application as research tools. However, their usefulness and generalizability in clinical practice are questionable. Most of the scales have been tested in nonrepresentative samples composed of college students or psychiatric patients and have not been adequately tested in important subpopulations of patients, such as elderly patients, minority group patients, and patients in common clinical settings, including emergency departments or primary care practices. Few of these scales have been tested in prospective studies, and those that have been tested have shown very low positive predictive validity and high rates of false positive findings. As a result, for the practicing clinician, these rating scales are primarily of value in learning to develop a thorough line of questioning about suicide (see Section II.C.4, "Understand the Relevance and Limitations of Suicide Assessment Scales"). It is for this reason that the specific rating scales will be reviewed briefly here. In addition, information about the scales may be helpful in interpreting the findings of other studies discussed in this guideline.

The Scale for Suicide Ideation (8) is a 19-item, clinician-administered scale that takes approximately 10 minutes to administer and was designed to quantify the intensity of current and conscious suicidal intent by assessing the extent and characteristics of suicidal thoughts; the patient's attitude toward suicidal thoughts; the wish to die; motivations, deterrents, and plans for a suicide attempt; and feelings of control and courage about a suicide attempt. Although standardized for use with adult psychiatric patients, the Scale for Suicide Ideation has been used in a variety of settings and has high levels of internal consistency and interrater reliability. Scores on the Scale for Suicide Ideation have been correlated with the self-harm item of the Beck Depression Inventory and have been shown to discriminate between depressed outpatients and patients hospitalized for suicidal ideation, despite similar levels of depression in the two groups (8), suggesting that the scale measures something above and beyond depression alone. Although the Scale for Suicide Ideation is one of the few instruments with a demonstrated positive predictive validity for suicide, its positive predictive value is only 3%, and it has a high rate of false positive findings (78). A number of modified versions of the Scale for Suicide Ideation exist, including a 21-item self-report version (741) and a measure of suicidal ideation at its worst, the SSI–W, which is also a 19-item, clinician-administered instrument (428).

The Suicide Behavior Questionnaire (SBQ) is a self-report measure of suicidal thoughts and behaviors that is significantly correlated with the Scale for Suicide Ideation (10). The original

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
In Re Subpoena in                                         )
                                                          )
COLLINS, et al.,                                          )
                                                          )
                                                          )
        v.                                                )        Case No. 1:07-mc-00333 (RJL)
                                                          )
                                                          )
                                                          )
SMITHKLINEBEECHAM CORP. d/b/a,                            )
GLAXOSMITHKLINE, INC.                                     )
                                                          )
_____)


## <u>PROPOSED ORDER</u>

This case is before the Court for consideration of the Government's Motion to Quash.

Upon consideration of the parties' submissions and record herein, by this Court this _____ day of

_____, 2007;

        IT IS **ORDERED** that the Motion to Quash is **DENIED**; and it is

        **FURTHER ORDERED** that this subpoena matter is remanded back to the Superior

Court for the District of Columbia and that the deposition of David Voyles will proceed.




                                        _____
                                        Hon. Richard J. Leon
                                        United States District Judge